BATTAGLIA, J.
The Petitioner, James Kulbicki, was convicted in 1995 of first-degree murder and the use of a firearm in the commission of a felony in the Circuit Court for Baltimore County,[1] based, in part, on the testimony of Agent Ernest Peele of the Federal Bureau of Investigation. Agent Peele testified that a bullet fragment found in Kulbicki’s truck and a bullet found inside the victim were “what you’d expect if you were examining two pieces of the same bullet,” and moreover, that a bullet recovered from a handgun found in Kulbicki’s home “could have been in the same box” as the bullet taken from the victim, relying on Comparative Bullet Lead Analysis (“CBLA”).[2] We determined, however, in 2006 that under the *37 Frye-Reed standard,[3] CBLA evidence was not generally accepted by the scientific community. Clemons v. State, 392 Md. 339, 896 A.2d 1059 (2006). One of the major flaws of CBLA, we observed in Clemons, was that it had been predicated on the assumption that each source of lead from which bullets were derived was unique, allowing bullets that come from different batches to be distinguished from one another, an assumption that we determined to be questionable; “The assumption that each molten lead source is unique is also being questioned by analytical chemists and metallurgists.” Id. at 369, 896 A.2d at 1077.
Kulbicki was convicted before Clemons was decided. Nevertheless, within a few years of his conviction, he sought post- *38 conviction relief under the Uniform Postconviction Procedure Act,[4] arguing not only that the admission of “unreliable” CBLA evidence was a due process violation, but that his attorneys rendered ineffective assistance of counsel for failing to adequately cross-examine Agent Peele.[5] The Circuit Court Judge denied relief, opining with respect to Kulbicki’s ineffective assistance of counsel claim that “questions concerning the reliability of that science didn’t even surface until long after *39 Mr. Kulbicki’s trial”, and therefore, Kulbicki’s attorneys could not be faulted for not challenging the CBLA evidence:
With CBLA, ineffective assistance is not a legitimate argument. The questions concerning the reliability of that science didn’t even surface until long after Mr. Kulbicki’s trial. The reputation for reliability of the FBI laboratories, which performed the analysis in this case, was well known and there is no evidence in this record to demonstrate they could have been effectively challenged at trial. And the undisputed evidence was that no private laboratories routinely performed this service at that time. Thus counsel was faced with the unquestioned expert in this field, which was generally accepted as competent evidence at the time of trial. That expert was appropriately cross-examined. Counsel cannot reasonably be faulted concerning their approach to CBLA evidence at the time of trial.
The Court of Special Appeals affirmed in a reported opinion, without addressing Kulbicki’s ineffective assistance of counsel claim as it related to Kulbicki’s attorneys’ exploration of CBLA evidence. Kulbicki v. State, 207 Md.App. 412, 450-53, 53 A.3d 361, 383-85 (2012). We granted certiorari to consider the following questions, which we have renumbered:[6]
1. Does the failure of defense counsel to investigate or challenge the State’s scientific evidence and failure to object to improper closing arguments suggesting guilt constitute ineffective assistance of counsel?
2. Does a conviction obtained through the use of scientific evidence that is later demonstrated to be unreliable, misleading, and inadmissible violate a defendant’s guarantee of due process?
3. Does the use of perjured expert testimony by a State expert violate a defendant’s due process rights when the perjured testimony involves the expert’s qualifications and background?
*40 Kulbicki v. State, 430 Md. 344, 61 A.3d 18 (2013). We also granted the State’s conditional cross-petition to address the following question:
Did the Court of Special Appeals err in stating that the State is chargeable with the “knowing use of perjured testimony” where the falsity is unknown at the time of the testimony?

Id.

Kulbicki did not argue that his attorneys were ineffective for failing to challenge the State’s CBLA evidence before the Court of Special Appeals and the intermediate appellate court did not address the issue. Ineffective assistance of counsel with respect to the CBLA evidence, moreover, was not addressed in Kulbicki’s brief before us; during oral argument, however, after the State argued that the admission of CBLA evidence was not a due process violation because Kulbicki’s attorneys should have been able to test the flawed assumptions upon which CBLA was based at trial, questions were raised by the Court regarding ineffectiveness of counsel.[7]
We shall hold that Kulbicki’s attorneys rendered ineffective assistance when they failed to investigate and cross-examine the State’s CBLA expert, Agent Ernest Peele, based upon a report he co-authored in 1991, which presaged the flaws in CBLA evidence, and therefore, will reverse Kulbicki’s conviction and order a new trial.[8]
*41 The present case began when, during the course of a homicide investigation by the Baltimore County Police Department, a bullet was recovered from the victim’s body. Thereafter, two bullet fragments were recovered from Kulbicki’s vehicle in addition to six bullets taken from a handgun found in Kulbicki’s home. The bullets were then analyzed by the FBI laboratory and the results were interpreted by Agent Ernest Peele, who testified for the State at Kulbicki’s trial.
Agent Peele testified that the CBLA process permitted him to analyze the chemical composition[9] of the lead contained within bullets and, using the chemical composition numbers, determine if the composition in the bullets were the same or substantially similar to each other. Based on the compositional similarities of the bullets he tested, Agent Peele drew a number of conclusions that purported to connect Kulbicki to the homicide.
Agent Peele testified, first, that a bullet fragment taken from the victim’s autopsy, designated “Q-l”, and one of the bullet fragments taken from Kulbicki’s truck, “Q-2”, were “what you’d expect if you were examining two pieces of the same bullet”:
[STATE’S ATTORNEY]: [W]hat conclusion did you draw, if any, when comparing Q-l and Q-2, those two bullet fragments?
[AGENT PEELE]: Well, Q-l and Q-2 have the same amounts of each and every element that we detected. To the extent that that’s what you’d expect if you were examining two pieces of the same bullet, they are that close, two pieces of the same source.
*42 [STATE’S ATTORNEY]: Uhm, I think in looking at your report you used the term analytically indistinguishable.
[AGENT PEELE]: Yes, sir. That’s a term basically meaning we can see each and every element. We can see the same quantity of each and every element in two different pieces such that if we were to drop those pieces, all of the samples from each one of, each of Q-l and Q-2 on the floor and, we would not be able to put them back into their respective sample they are that close together in composition.
Agent Peele then compared Q-6, one of the bullets recovered from the handgun, and the samples taken from the victim and Kulbicki’s truck, stating that, compositionally, they were “extremely” and “unusually close” so that “there’s some association” between the bullets:
[STATE’S ATTORNEY]: And what conclusions, if any, did you draw in comparing the compositional analysis or the composition of Q-6 in comparison to Q-l and Q-2, which are the bullet fragments?
[AGENT PEELE]: Well, Q-6 is measurably different from Q-l and Q-2 such that in the analytical process you can physically see that not all the elements have exactly the same composition. However, Q-6 is extremely close to Q1 and Q-2. It is unusually close in that that’s not what you’d expect, unless there’s some association between the two groups.
In other words, Q-l and Q-6, the amount of copper is slightly different and the amount of arsenic is slightly different. All the other elements are the same and, certainly, those are types of things that you wouldn’t expect to occur unless there’s some association, such as being made by the same manufacturer on or about the same time, that kind of association. They are close enough that I have seen those differences, even in the same larger piece but, certainly, they are also different enough that I can’t really include uhm [sic] as well as I would Q-l and 2 to each other.
*43 During re-direct, Agent Peele explained that, although it was not conclusive, the closeness in composition of the three bullets—the autopsy fragment, the truck fragment, and one of the bullets found in the handgun—was consistent with having originated from the same box of bullets, because in each box, he asserted, you would expect to find a number of distinct chemical compositions:
[STATE’S ATTORNEY]: [Y]our opinion was that as to Q-6, it’s that one bullet, when compared to fragments, I think your term was unusually close, extremely close in composition?
[AGENT PEELE]: Yes, sir.
[STATE’S ATTORNEY]: [W]ould you expect to see differences in the composition of bullets from the same box, or are all bullets from the same box exactly the same?
[AGENT PEELE]: Certainly not.
[STATE’S ATTORNEY]: Okay. Just explain that. I think you already answered. Just explain about the bullets in a box, how they can be different and you would expect them to be different.
[AGENT PEELE]: Yes, sir. Even in one box of ammunition, a box of 50 rounds of ammunition, the bullets in that box don’t all have the same composition. Normally even in one box you’ll have groups. For instance, 25 of the bullets may have the same composition such that it would have the same, that group would have the same amounts of each and every element measured. Another group would have a different composition—by different, something that was measurably different in one or more elements. Maybe all of the elements could be slightly different which would constitute, then, a second group.
This group, again, would have a number of bullets in it or it could have a number of bullets in it all the way from one up to—if the box only had two compositions and the first one had 25, this one would then have 25, as well. But, normally, there are several compositions in a box. Around *44 five. Especially in Remington ammo, there are fí-, normally five compositions even in one box, and those compositions differ from each other by varying amounts. The differences that I see, even in one box, certainly are no more than the differences that I see right here. So all these bullets at one time could have been in the same box. I’m not saying they were because they are different. And those differences may have been in the box; they may not have been but, certainly, these differences are not too great that all of them could not have been in the same box at one time—
(emphasis added).
Kulbicki’s defense counsel cross-examined Agent Peele regarding the analysis that he performed in the case, which had been documented in a report provided to them pretrial. Using the report, counsel questioned Agent Peele, primarily, regarding his conclusions related to the similarities in chemical composition amongst the varying samples. Based upon a number of questions posed by defense counsel, Agent Peele testified that, in his report, he had “grouped” the bullets based on the similarity of their composition, and placed four of the bullets taken from Kulbicki’s handgun, Q-5 through Q-8, in a separate “grouping” than the bullet found in the victim, indicating that there were differences in their compositions:
[COUNSEL FOR KULBICKI]: Okay. Now, you’ve testified on the second, on Page Two of your report, you have two groups listed within Group I and Group II, correct.
[AGENT PEELE]: Yes, sir.
[COUNSEL FOR KULBICKI]: And Group I you list that Q-l and Q-2 essentially have the same compositional components.
[AGENT PEELE]: That’s correct.
[COUNSEL FOR KULBICKI]: Okay. You’ve testified that Q-6 could be similar, but it’s measurably different.
[AGENT PEELE]: Q-6 has very similar composition, has a very similar overall composition with slight differences in two of the elements, yes, sir.
*45 [COUNSEL FOR KULBICKI]: But you didn’t list that in your report under Group I?
[AGENT PEELE]: No, sir, I did not. I included only those that were exact.
[COUNSEL FOR KULBICKI]: And as far as specimens Q-5, Q-6, Q-7 and Q-8, you determined that they belonged in neither group?
[AGENT PEELE]: Correct. They are all, they all have differences from what appears in Groups I and, II.
[COUNSEL FOR KULBICKI]: Okay. The differences were so great that they could not be linked to either group, correct?
[AGENT PEELE]: The differences were enough so that they were not put in any group, yes, sir.
(emphasis added).
During closing argument and rebuttal, the State seized on the CBLA testimony to argue that Kulbicki’s truck was the scene of the murder, and moreover, that Kulbicki’s handgun was the murder weapon. Specifically, the State argued that the “two bullet fragments, the one from [the victim’s] head, the one in the Defendant’s truck, are the same.... You can’t tell one from the other.” Likewise, the State argued to the jury that the bullet found in Kulbicki’s handgun was compositionally the same as the bullet found inside of the victim:
Even more interesting is Agent Peele’s examination of the bullets that he found inside that gun. Remember when he was talking about that Q-6, the Q-6 bullet and he said, I examined that compositionally. That Q-6 bullet is very nearly identical to the two bullet fragments, the one come coming from [the victim’s] head and the one coming from the autopsy. Very close in composition in parts per million. Not exact. He did not say it was exactly identical; he said it was very nearly close when he broke it down into parts per million. Now, think about this. Out of all the billions of bullets in this world, is this just a coincidence that that bullet ends up in the Defendant’s off-duty weapon? Is, is that just a coincidence? I don’t think so.
*46 (emphasis added). During closing argument, on behalf of Kulbicki, however, counsel never seriously challenged the State’s arguments regarding the CBLA evidence, aside from asserting that none of the compositional numbers “match up too closely”:
[W]hat we did was, when Agent Peele was testifying and we looked at his notes, you’ll see the different calculations. And, no, none of uhm [sic] match up too closely. I’m not an expert on bullets but, as you’ll see, there’s all different sorts of numbers on there. All different sorts of numbers.
The State’s CBLA evidence, therefore, was central to the State’s case. Defense counsel sought to undermine Agent Peele’s conclusions by questioning the compositional similarities or lack thereof among the various bullet fragments, but failed to explore, in any way, one of the fundamental assumptions of CBLA, which is that compositional sameness established an association among the bullets that were tested. Is this lapse significant for purposes of a claim for ineffective assistance of counsel?
Claims for ineffective assistance of counsel are evaluated under the United States Supreme Court’s decision in Strickland, v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, our analysis is twofold: we must decide whether counsel rendered constitutionally deficient performance and whether such deficient performance prejudiced the defendant’s case. Id. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. In discerning whether performance was deficient, we start with the presumption that counsel “rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment” and our review of counsel’s performance is “highly deferential.” Bowers v. State, 320 Md. 416, 421, 578 A.2d 734, 736 (1990); Strickland, 466 U.S. at 690, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Applying this framework, we look to whether counsel’s “representation fell below an objective standard of reasonableness.” Harris v. State, 303 Md. 685, 697, 496 A.2d 1074, 1080 (1985). We assess reasonableness, moreover, at “the time of *47 counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.
Evaluating the reasonableness of an attorney’s conduct “spawns few hard-edged rules”, State v. Borchardt, 396 Md. 586, 604, 914 A.2d 1126, 1136 (2007), but a number of principles have emerged that are relevant to the matter before us. In the course of representing a client, an attorney must make decisions on the basis of adequate investigation and preparation. See Coleman v. State, 434 Md. 320, 338, 75 A.3d 916, 927 (2013). This obligation extends with equal force to forensic evidence; “[f]ailure to investigate the forensic evidence is not what a competent lawyer would do.” Bowers, 320 Md. at 434, 578 A.2d at 743. We have also recognized that the failure to conduct an adequate cross-examination may be a basis for finding deficient performance under Strickland. See id.
The United States Court of Appeals for the Eighth Circuit has specifically recognized that the failure to properly investigate forensic methodology and adequately cross-examine a State’s forensic expert may be a basis for deficient performance. In Driscoll v. Delo, 71 F.3d 701, 704 (8th Cir.1995), Driscoll was charged with the murder of a corrections officer that occurred during a prison riot. The State argued that the murder had been committed with the use of a homemade knife that Driscoll had constructed while he was incarcerated. Id. at 707. At trial, the State presented the testimony of Dr. Su, the Chief Forensic Serologist with the Missouri Highway Patrol Crime Laboratory, whose report indicated that pursuant to a blood-identification test called the “thread” test, the victim’s blood-type, type O, was not found on the knife; Dr. Su testified, however, that the lack of the victim’s blood could be attributed to the presence of type-A blood from another victim, which, she argued, could have “masked” the presence of the type O blood. Id. at 707. Defense counsel never questioned Dr. Su about whether she had performed any other blood-identification tests on the knife. Id. It was discovered during the post-conviction proceedings that Dr. Su had in fact performed another test, the “lattes” test, which, unlike the *48 thread test, prevented masking from occurring. Id. at 707-08. The results of the lattes test revealed that there was no type 0 blood on Driscoll’s knife, but the existence of the lattes’ result was not brought out in cross-examination, so that the jury was left with the impression that Driscoll’s “knife likely had been exposed to both type A and type 0 blood.” Id. at 708.
On appeal, the Eighth Circuit considered the issue of “whether defense counsel’s performance in failing to investigate and to adequately cross-examine Dr. Su about the serology tests performed on the state’s evidence fell below an objectively reasonable standard of representation” and concluded that it had. Id. The court opined that Dr. Su’s report should have alerted counsel to the “possibility of conclusively detecting both A and O on the same item of evidence”, because the report indicated that both types of blood were found on the victim’s boots. Id. at 709 (emphasis omitted). Given the serious charges that Driscoll faced as well as the significance to the State of proving that the victim’s blood appeared on the alleged murder weapon, counsel’s failure “to prepare for the introduction of the serology evidence, to subject the state’s theories to the rigors of adversarial testing, and to prevent the jury from retiring with an inaccurate impression that the victim’s blood might have been present on the defendant’s knife” fell “short of reasonableness under the prevailing professional norms.” Id.
The failure, then, to appropriately investigate the State’s forensic evidence and challenge the State’s expert on cross-examination regarding a scientific method used to implicate the defendant may be a predicate upon which a claim for ineffective assistance of counsel may prevail. The Circuit Court Judge in the instant case, however, cognizant of the principle that counsels’ performance must be assessed at the time of Kulbicki’s trial, concluded that, “[w]ith CBLA, ineffective assistance is not a legitimate argument”, because, she reasoned, “questions concerning the reliability of that science didn’t even surface until long after Mr. Kulbicki’s trial.” We disagree.
*49 In 1991, four years prior to Kulbicki’s trial, Agent Peele and a number of his colleagues published a report which presaged the very flaw that ultimately lead us to conclude in Clemons that CBLA evidence was invalid and unreliable—the faulty assumption that bullets produced from different sources of lead would have a unique chemical composition. See Ernest R. Peele et al., Comparison of Bullets Using the Elemental Composition of the Lead Component in Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence 61 (June 24-28, 1991) (hereinafter “the 1991 Peele Report”). The study focused on the “compositional variability of bullet leads from four major U.S. Manufacturers”, with the goal of defining “the variability in element composition within individual bullets, among bullets within boxes of cartridges, among boxes packaged on the same date, among boxes packaged on different dates, and among boxes from the different manufacturers.” Id. at 57. To that end, Agent Peele and his colleagues analyzed the elemental composition of cartridges contained within full boxes of four different brands of .38 caliber cartridges—Cascade Cartridge Industries, Federal, Remington, and Winchester. Id. at 58.
The 1991 Peele Report observed, with respect to the Federal-brand cartridges, that, of the four boxes of Federal-brand cartridges that were tested, “three boxes contained] two distinct compositional groups.” Id. at 61. Significantly, the box identified as “box two” had “overlapping compositions” with boxes one and four, but had been packaged fifteen 'months earlier. Id. at 61.[10] The authors did not conduct any further research to explain the existence of overlapping compositions, but speculated as to a number of explanations, including that it was a “coincidence”; “because the bullets originated from the same analytically homogenous source of lead”; or “the cartridges were produced from a common lead *50 production source and component storage before cartridge loading”:
There are two possible explanations for the overlapping compositions for bullets packaged on different dates. Overlapping compositions occur either by coincidence or because the bullets originated from the same analytically homogenous source of lead. From our previous experience and discussion with Federal Cartridge Corporation representatives, a reasonable explanation for multiple boxes containing indistinguishable lead compositions is that the cartridges were produced from a common lead production source and component storage before cartridge loading.
Id. at 61-62.
The failure to fully explore the variance, however, is at odds with the scientific method, as we explained in Blackwell v. Wyeth, 408 Md. 575, 583, 971 A.2d 235, 240 (2009):
Once data is compiled, analysis occurs, from which conclusions are drawn; the hypothesis either remains viable or is disproven:
Note that a hypothesis or a theory is never proven or confirmed to be true. Testing is capable only of disconfirming. But theories that withstand such attempts at falsification better and longer become accepted, at least until something better comes along. The opposite approach can readily be seen in non-scientific activities of numerous kinds, where investigators engage in a search for evidence that confirms their suspicions. This confirmatory bias is based on the erroneous assumption that a theory is confirmed by the accumulation of facts consistent with the theory.... It is the diligent search for inconsistencies, for falsification, that really puts a theory to the test. A theory that can withstand such scrutiny is one that deserves credence.
Id. at 583, 971 A.2d at 240, quoting David L. Faigman, Michael J. Saks, Joseph Sanders & Edward K. Cheng, 1 Modern Scientific Evidence: The Law and Science of Expert Testimony, at 264 (2008). The speculation proffered by the 1991 Peele Report regarding the overlapping compositions is consistent *51 with “confirming suspicions”, rather than withstanding attempts at falsification.[11]
The 1991 Peele Report, however, called into question the assumption that no two sources of lead would ever produce bullets with the same chemical composition, as the 1991 Peele Report clearly indicated that two bullets produced fifteen months apart had the same composition. The Report, moreover, was published on June 24, 1991 and was available to Kulbicki’s attorney in 1995.[12] When Agent Peele was cross-examined, the 1991 study authored by him was never exhumed; the potential for having two bullets with the same composition produced at different times was never explored, even though opportunity knocked. During his re-cross exami *52 nation, Agent Peele, rather, testified that he would not expect a random bullet to match any of the bullets derived from the crime scene or Kulbicki’s handgun:
[KULBICKI’S COUNSEL]: Isn’t it true that if I gave you a Reming—, a Remington bullet at this time, the results could be similar to any of those as in Q-l through Q-9?
[AGENT PEELE]: I would not expect, if you hand me a Remington bullet right now, that it would be the same as any one of these, no, sir.
[KULBICKI’S COUNSEL]: I didn’t say the same. But it could be similar, correct?
[AGENT PEELE]: Well, it’s gonna be similar in that it’s going to have more than likely measurable amounts of all these elements, ... except tin; it probably will not have that. So in that respect, yes, it’s going to be similar,
(emphasis added).
Had Kulbicki’s attorneys investigated and discovered the 1991 Peele Report, they would have had a potent challenge to Agent Peele’s conclusion that the bullet fragment taken from the victim’s autopsy and the fragment found in Kulbicki’s truck was “what you’d expect if you were examining two pieces of the same bullet ... two pieces of the same source”, as well as the conclusion that a bullet taken from Kulbicki’s handgun and the bullet taken from the autopsy were similar enough, so that “there’s some association between the two groups.”[13] Kulbicki’s counsel, then, would have been able to posit the likelihood that the chemical composition of the bullet found in the victim could have matched other bullets, not analyzed by the FBI.
*53 Kulbicki’s attorneys’ failure to appropriately investigate the 1991 Peele Report and to challenge the State’s scientific evidence on cross-examination at trial, thus, fell short of prevailing professional norms. Given the serious nature of the charges Kulbicki was facing, along with the fact that CBLA was so persuasively used to connect Kulbicki to the alleged murder scene and murder weapon, it was incumbent on Kulbicki’s attorneys “to subject the state’s theories to the rigors of adversarial testing”. See Driscoll, 71 F.3d at 709. Having failed to research what Agent Peele had published about the forensic evidence about which he was testifying and having also failed to conduct an adequate cross-examination rendered Kulbicki’s counsels’ performance inadequate.[14]
Our next inquiry, then, is whether Kulbicki’s attorneys’ failure to adequately cross-examine Agent Peele and to *54 challenge the faulty assumptions upon which Agent Peele’s opinion was based prejudiced Kulbicki’s case. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. To prevail on the prejudice prong, there must be a showing that the deficient performance created a “substantial possibility” that, but for counsel’s errors, the outcome may have been different. Bowers, 320 Md. at 425-27, 578 A.2d at 738-39. We recently elucidated the “substantial possibility” standard in Coleman v. State, 434 Md. 320, 75 A.3d 916 (2013), in which we opined:
As to the prejudice prong of Strickland, which addresses whether an attorney’s deficient performance prejudiced the defendant, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; see also Taylor v. State, 428 Md. 386, 399-400, 51 A.3d 655, 662 (2012). In Oken, we explained that the petitioner must show “that there is a substantial possibility that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 343 Md. at 284, 681 A.2d at 44. *55 This Court has noted that “[a] proper analysis of prejudice ... should not focus solely on an outcome determination, but should consider ‘whether the result of the proceeding was fundamentally unfair or unreliable.’ ” Oken, 343 Md. at 284, 681 A.2d at 44 (quoting Lockhart v. Fretwell, 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180, 189 (1993)); see also Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 (explaining that, in determining prejudice, it is important to consider whether the trial’s result was reliable).
Id. at 340-41, 75 A.2d at 928.
We have frequently recognized the significance jurors afford to forensic evidence in assessing a defendant’s guilt or innocence. See Clemons, 392 Md. at 347 n. 6, 896 A.2d at 1064 n. 6 (noting that “jurors tend to give considerable weight to ‘scientific’ evidence when presented by ‘experts’ with impressive credentials”, quoting Reed v. State, 283 Md. 374, 386, 391 A.2d 364, 370 (1978)). The importance of the CBLA evidence to the instant matter, moreover, cannot be overstated. Agent Peele testified that the bullet fragments found in Kulbicki’s truck and in the victim were “what you’d expect if you were examining two pieces of the same bullet ... two pieces of the same source”. Likewise, Agent Peele testified that an unfired cartridge taken from Kulbicki’s handgun, while not analytically indistinguishable from the bullet taken from the victim’s autopsy, was “unusually close in that that’s not what you’d expect, unless there’s some association between the two groups.”
The State’s closing argument relied on forensic evidence to connect Kulbicki to the homicide: “Because we don’t have any witnesses who actually saw the Defendant put the gun to [the victim’s] head, we fill in the gaps. And the way we fill them in is with forensic science.” (emphasis added). The State, more specifically, relied in closing on Agent Peele’s CBLA analysis, asserting that “those two bullet fragments, the one from [the victim’s] head, the one in the Defendant’s truck, are the same.... You can’t tell one from the other.” Additionally, the State argued to the jury that the bullet found in Kulbicki’s *56 handgun was likely the same bullet found inside of the victim: “Even more interesting is Agent Peele’s examination of the bullets that he found inside that gun.... Now, think about this. Out of all the billions of bullets in this world, is this just a coincidence that that bullet ends up in the Defendant’s off-duty weapon? Is, is that just a coincidence? I don’t think so.”
Given the State’s rigorous reliance on CBLA evidence to connect Kulbieki to the crime, we conclude that there was a “substantial possibility” that the outcome would have been different had Kulbicki’s counsel questioned Agent Peele regarding the possibility of having compositionally similar bullets exist in different batches.[15] Having concluded that both prongs of Strickland have been satisfied, we hold that the Circuit Court erred in concluding that Kulbicki’s attorneys had not rendered ineffective assistance of counsel, and thus, remand for a new trial.[16]
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT *57 WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY.
HARRELL, McDONALD, and RODOWSKY, JJ., dissent.

. Kulbicki, originally, was convicted in 1993, but that conviction was reversed by the Court of Special Appeals. Kulbicki v. State, 102 Md.App. 376, 649 A.2d 1173 (1994). After Kulbicki was re-tried and convicted in 1995, the Court of Special Appeals affirmed the conviction in an unreported decision, and we denied his petition for a writ of certiorari. Kulbicki v. State, 345 Md. 236, 691 A.2d 1312 (1997).

. In Clemons v. State, 392 Md. 339, 896 A.2d 1059 (2006), we had occasion to explain the CBLA process as utilized by the FBI:
*37 After obtaining the elemental composition numbers, the samples are categorized “according to similarity of compositional presence.” "Compositions similar to a crime scene bullet(s) are put in one group and considered 'analytically indistinguishable’; compositions considered dissimilar are placed in different groups and considered 'analytically distinguishable.’ ” From that data, the expert witness will draw a conclusion as to the probative significance of “finding ‘analytically indistinguishable’ (similar) compositions in both crime scene and 'known’ bullet samples.” The entire process is premised upon three assumptions: the fragment being analyzed is representative of "the composition of the source from which it originated”; the source from which the sample is derived is compositionally homogeneous; and "no two molten sources are ever produced with the same composition.”
Clemons v. State, 392 Md. 339, 367-68, 896 A.2d 1059, 1076 (2006) (internal citations omitted). As we explained in Clemons, however, by 2006, the latter two assumptions had come under attack by the scientific community:
Recently the assumptions regarding that uniformity or homogeneity of the molten source and the uniqueness of each molten source that provide the foundation for CBLA have come under attack by the relevant scientific community of analytical chemists and metallurgists.
Id. at 368, 896 A.2d at 1076.

. The Frye-Reed test "is the test in Maryland for determining whether expert testimony is admissible. The name is derived from two cases, Frye v. United States, 293 F. 1013 (D.C.Cir.1923), where this standard of general acceptance in the relevant scientific community was first articulated, and Reed v. State, 283 Md. 374, 391 A.2d 364 (1978), where we adopted the Frye standard.” Blackwell v. Wyeth, 408 Md. 575, 577 n. 1, 971 A.2d 235, 237 n. 1 (2009).

. In 1997, when Kulbicki initiated these proceedings, the Uniform Postconviction Procedure Act was codified at Sections 645A et seq. of Article 27 the Maryland Code. It was re-codified in 2001 as part of the new Criminal Procedure Article. Chapter 10, Laws of Maryland 2001. The Act currently appears at Sections 7-101 et seq. of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl.Vol., 2013 Supp.).

. Kulbicki filed his initial Petition for Post-Conviction Relief in 1997 without the assistance of counsel. At his request, the hearing on his initial post-conviction claim was postponed until Kulbicki filed amended petitions in 2004 and 2005. After a number of additional requests for postponements by Kulbicki, in 2006, with the assistance of counsel, he filed another amended petition that consolidated various claims. The 2006 Petition alleged, with respect to Kulbicki’s claim of ineffective assistance of counsel that, "[a]lthough much of the evidence that has led to the demise of CBLA is newly discovered, the trial attorneys failed to make use of evidence that was in existence at the time.” Specifically, the Petition asserted the following:
1. The attorneys failed to request the underlying data forming the basis of the FBI’s conclusions regarding CBLA.
2. The attorneys failed to obtain independent statistical analysis that would have shown the FBI examiner was ignoring exculpatory data.
3. The attorneys failed to adequately cross-examine the CBLA expert, for example, the total number of bullets manufactured that would be analytically indistinguishable was not explored.
4. The attorneys failed to request a Fry e-Reed hearing that would have led to the suppression of the CBLA evidence.
6. Defense counsel failed to object on the ground that the FBI examiner’s opinions and conclusions were outside those expressed in his report and therefore the State had not given notice as required by discovery rules.
After we decided Clemons in 2006, Kulbicki filed a supplement to his post-conviction Petition, using our decision in Clemons to bolster his arguments that the admission of CBLA evidence entitled him to a new trial.

. Because we will conclude that Kulbicki is entitled to a new trial on the basis of ineffective assistance of counsel, we will not reach his remaining two questions, or the State's conditional cross-petition.

. While, ordinarily, we will not reach an issue that has not been argued by the parties, we retain discretion to do so. See Rule 8-131. In Braxton v. State, 123 Md.App. 599, 633, 720 A.2d 27, 43 (1998), our brethren on the Court of Special Appeals opined that Rule 8-131 confers discretion to consider an issue "not raised by the parties on appeal,” including in instances when the issue was “discussed at oral argument.”

. At Kulbicki’s post-conviction hearing, both of his attorneys testified that they had no recollection as to their preparation with respect to the State's CBLA evidence. One lawyer testified that he did not recall whether he had "investigated or spoke with anyone regarding the field of CBLA and its validity”; or whether he “reviewfed] any literature or articles on CBLA”. Kulbicki’s other attorney similarly testified that she did not recall whether they had considered calling "an expert on the *41 area of ... CBLA”; whether she had spoken with anybody "about the reliability of such evidence”; or whether she had met "with Peele personally prior to trial.”

. Agent Peele testified that he would look to the "quantity” of varying elements contained within the lead. Specifically, he asserted, the bullets were analyzed for six elements: copper, antimony, arsenic, bismuth, silver, and tin.

. Two boxes, designated boxes one and four, also had overlapping compositions, but that was attributed to the fact that they had "the same production and packaging date.” The 1991 Peele Report, at 61.

. The 1991 Peele Report, additionally, using a hypothetical, asserted that CBLA remained viable:
As an illustration of forensic application of this approach, let us take an example of one bullet removed from a victim, five cartridges from a revolver, and 44 cartridges from a box associated with the suspect. Each bullet component of all these specimens is analyzed. ... The composition of the bullet from the victim is analytically indistinguishable in all five elements determined from two bullets from the gun and twenty from the box. Two more bullets from the gun are compositionally indistinguishable from 10 others from the box. The last bullet from the gun is compositionally indistinguishable from seven others from the box. The seven remaining bullets from the box fall into two additional compositional groups. It is our opinion that these results are forensically significant in associating the victim, weapon, and suspect in this example.
Id. at 68. This, too, is inconsistent with the scientific method, as it failed to account for a flawed assumption that would undermine the hypothesis that compositional sameness implied association.

. The compilation, in which the 1991 Peele Report appears, Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence, was distributed to various public libraries in 1994. According to the Catalog of U.S. Government Publications, the compilation was distributed to depository libraries in "Shipping list no.: 94-0833-M”, indicating that it was distributed in 1994. See Catalog of U.S. Gov’t Publications, U.S. Gov’t Printing Office, http://catalog.gpo.gov/ (search "Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence’’, then follow hyperlink entitled "Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence [microform]: June 24-28, 1991, Forensic Science Research and Training Center, FBI Academy, Quantico, Virginia/”) (last visited August 20, 2014) (emphasis added).

. William Tobin, a former FBI examiner, testified at Kulbicki’s post-conviction hearing, challenging the conclusions Agent Peele offered at Kulbicki’s 1995 trial. With respect to Agent Peele’s testimony that the bullet taken from the victim's body and one of the bullets taken from Kulbicki's truck were "what you’d expect if you were examining two pieces of the same bullet”, Mr. Tobin testified that:
I don’t find that to be a valid observation, expectation. There are no data on which to have such an expectation. In other words, there has never been any meaningful or comprehensive research or studies to substantially support such an expectation.
*53 Regarding Agent Peele's testimony in which he opined that there was an unusually close compositional similarity to the bullet fragments found in Mr. Kulbicki's truck and in the victim, Mr. Tobin testified:
That is a meaningless characterization. There is no scientific foundation or validity to be able to make that type of characterization. I mean, there existed a statistical protocol by which to declare a match or non-match. So this is gobbledygook. Either use the protocol and—the analyst should have used the protocol that existed to declare a match.

. We recognize that courts from other jurisdictions have concluded that attorneys did not render ineffective assistance for failing to challenge the State's CBLA evidence. In many of those cases, however, defense counsel actually did challenge the flawed assumption regarding the uniqueness of the lead sources from which the bullets were derived, which Kulbicki’s attorneys did not do. See United States v. Higgs, 663 F.3d 726, 739 (4th Cir.2011) (observing that trial counsel "impeach[ed] the uniqueness and homogeneity of lead melts, as well as the overall probative value of the CBLA evidence”); United States v. Davis, 406 F.3d 505, 509 (8th Cir.2005) (noting that defense counsel offered the testimony of another CBLA expert who observed that the State's expert had not ”test[ed] the composition of other bullets available in the community to see if he could find other analytically indistinguishable bullets”). In other cases, the 1991 Peele Report, which was not published before June 24, 1991, was not available to defense counsel. See Smith v. Secy, Dep’t of Corr., 572 F.3d 1327, 1350 (11th Cir.2009) (1990 trial); Libby v. McDaniel, 2011 WL 1301537 (D.Nev.2011) (1990 trial); Wyatt v. State, 71 So.3d 86, 100 (Fla.2011) (noting that in the *54 1991 trial "the flaws inherent in CBLA science were unknown or not publically acknowledged at the time of trial.”) CWyatt I"); Wyatt v. State, 78 So.3d 512, 533 (Fla.2011) (1991 conviction, adopting the same rationale as Wyatt I).
We note, also, that counsels' performance regarding the CBLA evidence and Agent Peele cannot be justified as strategic, because it was not "founded 'upon adequate investigation and preparation.’ ” Coleman v. State, 434 Md. 320, 338, 75 A.3d 916, 927 (2013), quoting State v. Borchardt, 396 Md. 586, 604, 914 A.2d 1126, 1136 (2007). Because Kulbicki’s attorneys did not refer to the 1991 Peele Report, they could not have made a rational and informed decision as to the scope of their cross-examination of Agent Peele. See id.; see also Foster v. Lockhart, 9 F.3d 722, 726 (8th Cir.1993) ("Before an attorney can make a reasonable strategic choice against pursuing a certain line of investigation, the attorney must obtain the facts needed to make the decision. An attorney’s strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.” (internal citations and quotations omitted)).

. Although the Circuit Court Judge concluded that Kulbieki was not entitled to post-conviction relief, she also noted the significance of the CBLA evidence, opining that, "[c]learly the bullet analysis was central to the theory of the prosecution.”

. There may be instances in which a limited remand is the more appropriate remedy for errors committed by post-conviction courts on claims based on ineffective assistance of counsel. For example, in State v. Thomas, 325 Md. 160, 599 A.2d 1171 (1992), the petitioner, Thomas, had alleged that post-conviction relief was appropriate because his attorney rendered ineffective assistance of counsel by permitting Thomas to be interviewed by a State psychiatrist before sentencing without an attorney. The State argued that the decision was a strategic one, and thus, did not constitute deficient performance. We observed, however, that the post-conviction court did not permit Thomas’s attorney to testify as to prior psychiatric assessments of Thomas, and therefore, we were not equipped to discern whether such a decision could be attributed to strategy. Accordingly, we remanded the case for further proceedings.
A limited remand in the instant case is unnecessary because both of Kulbicki's attorneys were questioned substantially regarding their investigation and strategy with respect to the CBLA evidence, of which they had no recollection.