# IN THE COURT OF APPEALS OF IOWA

No. 16-1104
Filed June 7, 2017

**STATE OF IOWA,**
          Plaintiff-Appellee,

**vs.**

**PATRICIA PRANSCHKE,**
          Defendant-Appellant.
_____


Appeal from the Iowa District Court for Monona County, Patrick H. Tott, Judge.


Patricia Pranschke appeals her convictions of first-degree harassment and assault on a police officer, arguing her trial counsel was ineffective and challenging the sufficiency of the evidence to support her first-degree harassment conviction. **AFFIRMED.**


Priscilla E. Forsyth, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.


Heard by Vogel, P.J., and Doyle and McDonald, JJ.

**DOYLE, Judge.**

Patricia Pranschke appeals her convictions of first-degree harassment and assault on a police officer after she tussled with a law-enforcement officer who entered her home without knocking, without her consent, and without a search warrant. She argues her trial counsel was ineffective in several respects, including failing to appeal her conviction of interference with official acts. She also challenges the sufficiency of the evidence to support her first-degree-harassment conviction. Upon our review, we affirm her convictions.

### I. Background Facts and Proceedings.

Viewing the trial evidence in the light most favorable to the jury's guilty verdicts, *State v. Romer*, 832 N.W.2d 169, 172-73 (Iowa 2013), the jury could have found the following facts. Terri Andersen is Patricia Pranschke's adult daughter. In April 2015, a warrant was issued for Andersen's arrest. The warrant related to a traffic violation issued to Andersen for driving on a suspended license.

On October 25, 2015, Monona County Deputy Sheriff Robert Maule was on duty and in full uniform. Driving in a marked Monona County Sheriff's Office Tahoe, the deputy was out searching for individuals that had outstanding arrest warrants, including Andersen. Deputy Maule had a copy of Andersen's photo from a previous booking so he could identify her. The deputy was informed by dispatch that Andersen "would be living or with her mom in Castana, and that

that would be the first place they would go look" for Andersen.[1] The deputy was given Pranschke's address and drove to her home.

As he was pulling into Pranschke's driveway, Deputy Maule observed Andersen standing in the driveway. When Andersen saw the deputy, "she immediately started running toward the house." The deputy parked, got out of his vehicle, and yelled for Andersen to stop. Andersen did not; instead, she went inside Pranschke's house, closing the door behind her. Deputy Maule ran after Andersen and entered the house without knocking or announcing himself.

Andersen ran into a bedroom, and the deputy attempted to follow Andersen but was stopped by Pranschke. Pranschke "immediately" told the deputy to "get the f**k out of [her] house." The deputy "tried to explain to her that [he] saw [Andersen] run inside and she had an active warrant." Pranschke was standing in the middle of the hallway, and when Deputy Maule "tried to go by, she stopped [him] and then did a quick shove to [him]." The deputy told Pranschke that "if she placed her hands on [him] again she would be going to jail." The deputy tried to move around Pranschke, but Pranschke hit his arm down. Deputy Maule asked Pranschke to step aside, but she did not.

Pranschke then called 9-1-1, seeking assistance with her demand that the deputy leave her home. While on the phone, Deputy Maule informed Pranschke he had a warrant to arrest Andersen, who had just run into Pranschke's house. The 9-1-1 operator also told Pranschke that Deputy Maule had an arrest warrant for Andersen and that he would leave as soon as she produced Andersen. The

---

[1] The minutes of testimony indicate Deputy Maule "received a tip that [Andersen] . . . could be at [Pranschke's] house." Deputy Maule's report says he "was informed Andersen could be at [Pranschke's] house."

operator told Pranschke another officer was coming to her home. The operator hung up on Pranschke following Pranschke's use of vulgar language.

Thereafter, the deputy continued his attempts "to explain the situation" to Pranschke "and why [he] was there. . . . That [Andersen] had a warrant." Pranschke told Deputy Maule, "Fine, I'm going to get my gun and shoot you." The deputy took this as a threat. Pranschke then "turned to the right and started walking toward the bedroom," and the deputy thought Pranschke was actually "going to get a gun and shoot [him]." To stop Pranschke, Deputy Maule "grabbed [Pranschke] by the . . . arms when she was walking away from [him], just right above the elbows." He told Pranschke "she was going to be under arrest" and to "[p]ut her hands behind her back." Pranschke "started flailing, throwing elbows . . . back toward [him]," hitting him in the chest. Deputy Maule pinned Pranschke up against her washing machine, asked her to stop resisting, and handcuffed her. At that point, Andersen "came [walking] out of the bedroom," and the deputy grabbed Andersen by the arm. Deputy Maule let go of Pranschke to put handcuffs on Andersen while Pranschke yelled at him. The deputy took both women outside. Pranschke asked Deputy Maule why she was going to jail, and he told her "it was reference to you can't threaten to shoot me," and Pranschke responded that she "was joking about that." It was no joke to the deputy.

Iowa State Patrol Sergeant Michael Kober was dispatched to Pranschke's residence to assist Deputy Maule. When Sergeant Kober arrived, he saw the deputy on Pranschke's patio with Pranschke and Andersen. Pranschke was "very irate" and "very argumentative" towards Deputy Maule. Sergeant Kober

escorted Pranschke to his patrol car and listened to Pranschke "scream that she wanted charges filed on Deputy Maule for assault and that she wanted him removed from the residence."

The sergeant read Pranschke her *Miranda* rights and transported Pranschke to the county jail. On the way, Pranschke asked "what she was being arrested for," and Sergeant Kober told her he "wasn't sure, that Deputy Maule was taking care of those charges." The sergeant told Pranschke "Deputy Maule had said she said that she should get a gun and shoot him. She said she did not say that." Pranschke told Sergeant Kober that she told the deputy she "could shoot [the deputy] if [she] wanted to. [She has] a gun. [She has] a weapons permit. She didn't say she should shoot him. She said she could shoot him." Pranschke "then . . . made another statement that she had a weapons permit and legally owned a gun."

The same day, Deputy Maule filed three criminal complaints against Pranschke, alleging she committed: (1) first-degree harassment, an aggravated misdemeanor, in violation of Iowa Code section 708.7(2) (2015); (2) assault on persons engaged in certain occupations, a serious misdemeanor, in violation of section 708.3A(4); and (3) interference with official acts, a simple misdemeanor, in violation of section 719.1(1)(b). Because the latter alleged offense was a simple misdemeanor and not an indictable offense, it was assigned a separate case number, SMSM108130; the other two offenses were assigned as counts one and two of AGCR016141. *See* Iowa Code § 801.4(8) ("'Indictable offense' means an offense other than a simple misdemeanor."); Iowa R. Crim. P. 2.6(1) ("Two or more indictable public offenses which arise from the same transaction

or occurrence . . . shall be alleged and prosecuted as separate counts in a single complaint, information or indictment . . . .").  The parties agreed SMSM108130 would be tried to the court contemporaneously with the jury trial in AGCR016141.

Deputy Maule and Sergeant Kober testified at Pranschke's July 2016 trial as set forth above.  Pranschke also testified, giving a different account of events.  Pranschke testified she had been babysitting her six-month-old great-grandson and had just laid him down to sleep in her bedroom when she came out of her room, "passed that opening that comes from the door and [Deputy] Maule swung the door open and came in and [she] stood there and [she] went whoa.  And he stopped."  She testified that she did not even know Andersen was in her house but admitted he told her that Andersen had just run into her house.  Contrary to Deputy Maule's testimony, Pranschke testified that she asked him to show her a warrant, and "he continually shook his head at [her]."  She denied pushing him or threatening him with a gun, though she admitted she may have said, while talking to herself aloud, that she had a gun permit.  She testified the deputy immediately asked her, "[D]id you say you were going to get a gun and shoot me?"  She testified she replied, "[W]here did that come from?" and "[N]o, . . . that's not what I said."  She also denied saying anything to Sergeant Kober thereafter about her gun or gun permit.

The jury found Pranschke guilty of both indictable offenses.  On June 13, 2016, Pranschke's trial counsel filed a motion for a new trial and in arrest of judgment, challenging the weight of the evidence to support her convictions in AGCR016141.  A hearing on the motion was set the same day as sentencing.  That day, before taking up the motion, the court stated it had prepared and would

be filing its ruling in SMSM108130 finding Pranschke guilty of interference with official acts. The court then heard counsels' arguments on Pranschke's motion. Pranschke's counsel was asked if he had anything he wanted "to add in addition [to] those two motions or any evidence [he'd] like to offer." Pranschke's counsel answered in the negative. The court subsequently denied Pranschke's motion and proceeded to sentence her on all three convictions.

On June 27, 2016, Pranschke's trial counsel filed a notice of appeal. The notice only referenced Pranschke's convictions in AGCR016141. No filing seeking discretionary review of her conviction in SMSM108130 was made. However, Pranschke's application for appointment of appellate counsel, filed the same day, stated she sought counsel in case number "AGCR016141/SMSM108130."

Pranschke now appeals. She contends her trial counsel rendered ineffective assistance, and she also challenges the sufficiency of the evidence to support her conviction of first-degree harassment.

## II. Ineffective Assistance of Counsel.

On appeal, Pranschke asserts her trial counsel was ineffective in three respects: (1) failing "to move to suppress evidence or dismiss the charges based on Deputy Maule's entry into [her] home without consent, exigency or a search warrant," (2) "failing to present and argue a defense of property justification for any contact with Deputy Maule after his illegal entry into her home," and (3) "failing to file a notice of appeal" in SMSM108130. Our review of her ineffective-assistance-of-counsel claims is de novo. *See State v. Harris*, 891 N.W.2d 182, 185 (Iowa 2017). Although claims of ineffective assistance of

counsel are usually addressed in postconviction-relief proceedings, they can be considered on direct appeal if the record is adequate. *See id.* at 186.

To succeed on a claim of ineffective assistance of counsel, a defendant must prove "by a preponderance of evidence that '(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice.'" *Id.* at 185 (citation omitted). If Pranschke cannot establish both elements, her claim fails; thus, if we find one element lacking, we need not address the other element. *See State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016); *State v. Lopez*, 872 N.W.2d 159, 169 (Iowa 2015). The burden is on the defendant "to present facts establishing inadequate representation." *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). "Trial counsel is not ineffective in failing to urge an issue that has no merit." *Harris*, 891 N.W.2d at 186.

### A. *Failure to Seek Discretionary Review of SMSM108130.*

Taking this issue out of order, we must first determine if we can even address this ineffective-assistance-of-counsel claim in this appeal. *See Lloyd v. State*, 251 N.W.2d 551, 558 (Iowa 1977) ("It is elementary that the court's first duty is to determine its jurisdiction to entertain and decide a case on its merits."). It is undisputed that Pranschke intended to appeal her interference-with-official-acts conviction in SMSM108130. It also appears it is not disputed that trial counsel did not seek discretionary review in SMSM108130.[2] *See, e.g.*, Iowa Code §§ 814.1 (defining "appeal" and "discretionary review"), 814.6(1)(a) (excluding the absolute right of appeal in simple misdemeanor cases),

---

[2] It also does not appear that Pranschke ever attempted to seek a delayed application for discretionary review of the issue after the fact.

814.6(2)(d) (granting appeal of simple misdemeanors upon appellate court's discretion); Iowa R. App. P. 6.106 (explaining how to apply for discretionary review).

The Iowa Supreme Court has explicitly stated that failing "to appeal on time is a jurisdictional defect," and an appellate court "has a duty to determine its own jurisdiction and to refuse, on its own motion, to entertain an appeal not authorized by rule." *Jensen v. State*, 312 N.W.2d 581, 582 (Iowa 1981); *see also Nuzum v. State*, 300 N.W.2d 131, 133 (Iowa 1981). But, the supreme court has also, "in certain criminal cases, granted a right of delayed appeal . . . where it appears that state action or other circumstances beyond appellant's control have frustrated an intention to appeal." *Swanson v. State*, 406 N.W.2d 792, 792-93 (Iowa 1987) (footnote omitted). A panel of this court concluded we did not have jurisdiction to address a claim related to a conviction that was not properly appealed where the appellant appealed only one of his two convictions and the supreme court had already rejected his motion for a delayed appeal concerning the conviction that was not appealed. *See State v. Whitehorn*, No. 14-1210, 2015 WL 6509736, at *2 (Iowa Ct. App. Oct. 28, 2015).

Here, Pranschke's counsel did not file an application for discretionary review though it is undisputed that Pranschke wanted to appeal her conviction in SMSM108130 along with her other two convictions. Appellate counsel did not seek approval from the Iowa Supreme Court for a delayed appeal. Consequently, we have no jurisdiction to decide the matter.

### B. *Failure to Move to Suppress Evidence or Dismiss Charges.*

We next consider whether a motion to suppress evidence or to dismiss charges against Pranschke would have been meritorious had it been raised by her trial counsel. Pranschke argues trial counsel should have sought such a ruling because the deputy's entry into her home was illegal—i.e., without her consent, without exigent circumstances, and without a search warrant. In response, the State essentially concedes Deputy Maule's entry was not legal, acknowledging that Andersen did not live with Pranschke, the deputy did not have an arrest warrant or search warrant related to Pranschke or Pranschke's home, and Pranschke did not consent to the deputy's entry into her home.[3] The State certainly does not assert that Pranschke did not have a legitimate expectation of privacy in her home. Rather, the State challenges the remedy, questioning "whether or not Pranschke's acts or actions in interfering or obstructing the deputy in his efforts to execute an arrest warrant for [Andersen], and in physically assaulting him qualifies as 'evidence' that would fall under the 'fruit-of-the-poisonous-tree' doctrine."

"The Fourth Amendment to the United States Constitution assures '[the] right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures.'" *State v. Lewis*, 675 N.W.2d 516, 522 (Iowa 2004) (citation omitted). "Article I, section 8 of the Iowa Constitution is

---

[3] The State argues exigent circumstances existed as the deputy was in "hot pursuit" of Andersen at the time he entered Pranschke's house. "Hot pursuit describes the situation when the police are pursuing a suspect who is in the process of fleeing from a recently committed crime." *State v. Naujoks*, 637 N.W.2d 101, 109 (Iowa 2001). This was no "hot pursuit." At best, the circumstances here appear to be more of a "warm pursuit," but we need not decide whether an exigency existed in view of our conclusion that the exclusionary rule does not apply.

the 'nearly identical [provision] to the Fourth Amendment to the United States Constitution.'"[4]   *State v. Brown*, 890 N.W.2d 315, 322 (Iowa 2017) (citation omitted).  "To protect citizens against unreasonable searches and seizures, the Fourth Amendment requires that the government must obtain a warrant before it may search or enter an area in which a person has a reasonable expectation of privacy."  *State v. Legg*, 633 N.W.2d 763, 767 (Iowa 2001).

To "deter lawless police conduct and to protect the integrity of the judicial system," evidence that is "discovered as a result of illegal government activity" will generally be excluded.  *State v. McGrane*, 733 N.W.2d 671, 680-81 (Iowa 2007).  This principle, known as the exclusionary rule, may also prevent the "introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search."  *Id.*  But, the "fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies."  *Herring v. United States*, 555 U.S. 135, 140 (2009).  "In other words, exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence."  *Hudson v. Michigan*, 547 U.S. 586, 592 (2006).  Rather, exclusion is a judicial remedy employed as a last resort "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  *Herring,* 555 U.S. at 140, 144; *see also Utah v. Strieff*, 136 S. Ct.

---

[4] Pranschke has not asked us, nor have we found a basis, to distinguish the protection afforded by the Iowa Constitution from that afforded by the Federal Constitution under the facts of this case.  Therefore, our analysis of the search issue will apply equally to both the state and federal constitutional grounds raised by Pranschke.  *See State v. Nitcher*, 720 N.W.2d 547, 553 (Iowa 2006).

2056, 2061 (2016) ("But the significant costs of this rule have led us to deem it 'applicable only . . . where its deterrence benefits outweigh its substantial social costs.'" (citations omitted)). Consequently, exceptions to the exclusionary rule have formed over time "involv[ing] the causal relationship between the unconstitutional act and the discovery of evidence." *Strieff*, 136 S. Ct. at 2061 (discussing exceptions to the rule); *see also Hudson*, 547 U.S. at 591-93 (discussing evolution of exceptions to the rule).

One exception—the attenuation doctrine—"permits use of certain evidence when circumstances independent of the initial illegality have so attenuated the causal connection as to purge the taint of the unlawful police action." *Naujoks*, 637 N.W.2d at 111-12; *see also Strieff*, 136 S. Ct. at 2061 (explaining the attenuation doctrine allows certain evidence to be admitted if "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" (citation omitted)); *State v. Seager*, 571 N.W.2d 204, 211 (Iowa 1997) (discussing the "independent source" and "inevitable discovery" exceptions essentially as extensions of the attenuation doctrine because both exceptions apply to situations where "it is possible to remove the taint of a prior illegality").

Another exception that has been adopted in many other jurisdictions, generally as an extension of the attenuation doctrine, is the "new-crime exception," explained as follows:

On occasion, when the police conduct an illegal arrest or an illegal search, this will prompt the person arrested or subjected to the search to react by committing some criminal offense. He might attack the arresting or searching officer, flee from that officer, attempt to bribe him, threaten the officer with harm should he testify against him, attempt to destroy evidence, or make some criminal misrepresentation in an effort to bring the incident to a close. In such cases, courts are confronted with the question of whether evidence of this new crime (or other evidence discovered after it) must be suppressed as a fruit of the prior illegal arrest or search.

. . . .

In cases where the response has been a physical attack (or threat of same) upon the officer making the illegal arrest or search, courts have again held that the evidence of this new crime . . . is admissible.

. . . .

[I]t is sometimes said by way of explanation that the attack upon the officer was a "free and independent action." But . . . the better basis of distinction is that no exploitation of the prior illegality is involved and that the rationale of the exclusionary rule does not justify its extension to this extreme.

. . . .

It is possible, however, that the nature of a particular Fourth Amendment violation will be such that defensive action by the victim can fairly be characterized as a response to exploitation, in which case a different result would be called for.

6 Wayne R. LaFave, *Search & Seizure* § 11.4(j), Westlaw (5th ed. updated Oct. 2016) (footnotes omitted); *see also, e.g.*, *State v. Brocuglio*, 826 A.2d 145, 151-52 (Conn. 2003) (adopting the new-crime exception, finding "a new crime committed in response to an unlawful police entry into one's residence is attenuated sufficiently to break the chain of causation from the unlawful entry," and setting forth numerous citations); *C.P. v. State*, 39 N.E.3d 1174, 1180-82 (Ind. Ct. App. 2015) (adopting "new-crime" exception, holding that "notwithstanding a strong causal connection in fact between an illegal search or seizure by law enforcement and a defendant's response, if the defendant's response is itself a new and distinct crime, then evidence of the new crime is

admissible notwithstanding the prior illegality," and listing numerous jurisdictions that have adopted the "new-crime" exception to the exclusionary rule.); *State v. Panarello*, 949 A.2d 732, 736 (N.H. 2008) (same); *State v. Herrerra*, 48 A.3d 1009, 1024 (N.J. 2012) (discussing the new-crime exception and citing jurisdictions that have adopted the exception, but ultimately finding its adoption unnecessary to reach its conclusion that, regardless of the legality of the law enforcement official's stop, the exclusionary rule did not apply to evidence of defendants' attempt to murder the officer after the stop).

The Iowa Supreme Court has expressly approved and adopted the Eighth Circuit's acceptance of what is essentially the new-crime exception:

> As an additional justification for Dawdy's arrest, the government notes that several courts consider resistance to even an illegal arrest to be grounds for a second, legitimate arrest. . . . [W]e now hold that a defendant's response to even an invalid arrest or . . . stop may constitute independent grounds for arrest.
> . . . Probable cause for arrest or for search and seizure exists where the circumstances are "sufficient in themselves to warrant a man of reasonable caution in the belief" that criminal activity is in progress or has occurred. . . . The struggle that ensued when the state trooper attempted to handcuff Dawdy, though quickly suppressed, would provide a reasonable police officer with probable cause for an arrest under Iowa law. *See* [Iowa Code § 804.12 (1994)] (stating that a person is not authorized to use force to resist an arrest . . . even if the person believes that the arrest is unlawful or the arrest is in fact unlawful). . . . Thus, assuming arguendo that [the officer's] initial stop and arrest of Dawdy were invalid, Dawdy's resistance provided independent grounds for his arrest . . . .

*State v. Dawdy*, 533 N.W.2d 551, 555-56 (Iowa 1995) (quoting *United States v. Dawdy*, 46 F.3d 1427, 1430-31 (8th Cir. 1995), *cert. denied*, 516 U.S. 872 (1995)); *see also Smith v. State*, 542 N.W.2d 567, 569 (Iowa 1996) ("For example, one may be guilty of the crime of resisting arrest even if the initial arrest

is illegal."). Given the court's recognition of the Eighth Circuit's reasoning in *Dawdy*, along with the considerable number of authorities that have expressly adopted the new-crime exception, we find it appropriate to apply the exception to the facts of this case. Thus, even if Deputy Maule's entry into Pranschke's home was unlawful, her actions after he entered her home—particularly in light of the facts that he was in uniform and explained why he was in her home—constitute new crimes for which the exclusionary rule does not apply.[5] As a result, a motion to suppress challenging the admission of evidence of Pranschke's subsequent actions would have been futile. Consequently, her trial counsel had no duty to file the motion and was not ineffective in AGCR016141 as a matter of law in this respect. *See Harris*, 891 N.W.2d at 186.

### C. *Failure to Present Justification Defense.*

Pranschke also argues her trial counsel was ineffective for not presenting a justification defense. Iowa Code section 704.4 allows a person to use "reasonable force to prevent or terminate criminal interference with the person's

---

[5] Nevertheless, we do not sanction unlawful entry into the homes of private citizens by law enforcement officials, particularly where—as in this case—(1) the underlying arrest warrant was for a minor, nonviolent crime that had been outstanding for months and Deputy Maule knew Andersen did not live at the residence and (2) numerous other options were available to the deputy before charging into Pranschke's home. Among those options, Iowa, like many states, has a "knock and announce" law that is designed to protect "human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson*, 547 U.S. at 594; *see also* Iowa Code § 804.15 (codifying the knock-and-announce rule); *State v. Kubit*, 627 N.W.2d 914, 918 (Iowa 2001) (discussing section 804.15), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601 (Iowa 2001). The rule also

> protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the "opportunity to prepare themselves for" the entry of the police. "The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed." In other words, it assures the opportunity to collect oneself before answering the door.

*Hudson*, 547 U.S. at 594 (citations omitted).

possession or other right in property." But, Iowa Code section 804.12 provides, "A person is not authorized to use force to resist an arrest, either of the person's self, or another which the person knows is being made . . . by a peace officer . . . even if the person believes that the arrest is unlawful or the arrest is in fact unlawful." Without deciding whether section 704.4 even applies under the circumstances presented, we believe section 804.12 trumps section 704.4 here. Consequently, Pranschke's trial counsel had no duty to present a justification defense, and her counsel was not ineffective as a matter of law.

### III. Sufficiency of the Evidence.

Finally, we address Pranschke's claim that there was insufficient evidence to support her first-degree harassment conviction. "We review sufficiency-of-the-evidence challenges for correction of errors at law." *Schlitter*, 881 N.W.2d at 388. A jury's guilty verdict will be upheld unless it lacks substantial evidence to support it. *See State v. Reed*, 875 N.W.2d 693, 704 (Iowa 2016); *State v. Hickman*, 576 N.W.2d 364, 366 (Iowa 1998). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Reed*, 875 N.W.2d at 704-05 (citation omitted). In making this determination, we do not review just the inculpatory evidence; rather, all of the record evidence must be considered, "including any reasonable inferences that may be fairly drawn from the evidence." *Id.* at 705 (citation omitted). But, we recognize that the jury was free to reject or credit certain evidence. *See id.*

"A person commits harassment when the person, purposefully and without legitimate purpose, has personal contact with another person, with the intent to

threaten, intimidate, or alarm that other person." Iowa Code § 708.7(1)(b). The "statute requires that at the time the defendant purposefully has personal contact with another, he or she also has the 'specific intent to threaten, intimidate, or alarm' them." *In re D.S.*, 856 N.W.2d 348, 352-53 (Iowa 2014) (citations omitted). The crime is raised to the highest degree "when the person commits harassment involving a threat to commit a forcible felony." Iowa Code § 708.7(2).

Pranschke argues there was insufficient evidence to prove she had illegitimate "purposeful personal contact" with Deputy Maule. She contends that she had a legitimate purpose for her contact and threats to the deputy—his illegal entry into her home. Viewing the evidence in the light in the most favorable to the State, there is sufficient evidence in the record to support the conviction. The deputy's testimony was that Pranschke smacked his arm, elbowed him in the chest, verbally threatened him, and then proceeded to walk away, which the deputy took as her going for her weapon. Additionally, pursuant to section 804.12, even if the arrest is unlawful, a "person is not authorized to use force to resist an arrest, either of the person's self, or another which the person knows is being made . . . by a peace officer . . . ." The jury was free to reject Pranschke's version of events and accept the two officers' account that Pranschke struck Deputy Maule and threatened to shoot him. Clearly, a rational jury could be convinced Pranschke was guilty beyond a reasonable doubt based upon this record.

*IV. Conclusion.*

We conclude a motion to suppress based upon the deputy's unlawful entry into Pranschke's home would not have been successful, and therefore Pranschke's trial counsel was not ineffective for failing to file such a motion. We also conclude Pranschke's trial counsel was not ineffective in failing to present a justification defense. Finally, viewing the evidence in the light most favorable to the State, we conclude there was sufficient evidence to support Pranschke's first-degree-harassment conviction. Accordingly, we affirm her convictions.

**AFFIRMED.**