Filed 5/1/25  P. v. Rodriguez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA AMANDO RODRIGUEZ,<br><br>Defendant and Appellant. | F085960<br><br>(Super. Ct. No. CRF64744)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

After a petty quarrel on social media intensified, two groups of young people agreed to meet one night in a high school parking lot where one member from each group

was to fight to resolve the dispute. Appellant Joshua Amando Rodriguez — not one of the two designated fighters — instead brought a gun. Unfortunately, perhaps because of the online squabble, Rodriguez pulled his gun out of his waistband and approached the opposing group's two pickup trucks as they pulled to a stop in the otherwise empty parking lot.

Rodriguez began shouting for Eric A., one of the original instigators of the social media dispute and one of the would–be fight contestants. Rodriguez found Eric A. seated in the passenger seat of the first truck, thrust his gun through the partially open passenger side window, and struck Eric A. in the head. Eric A. pushed Rodriguez's arm back out the window and Rodriguez responded by quickly firing three shots, one of which struck Eric A. and killed him. Ira K., the driver, had started to pull away when Eric A. pushed Rodriguez's arm out the window, although he was not shot.

Rodriguez then turned and fired several more shots at the second truck as it too began to drive away, until his weapon either jammed or ran out of ammunition. Neither occupant of the second truck, driver Jacob N. or passenger Seth C., was hit.

A jury convicted Rodriguez of the first degree murder of Eric A. with a true finding of a firearm use allegation. (Pen. Code,[1] §§ 187, subd. (a); 189, subd. (a); 12022.53, subd. (d)). They also convicted Rodriguez of three counts of attempted murder: one as to Ira K.; and one each as to Jacob N. and Seth C. The jury rejected premeditation allegations on the attempted murders, but found gun–use allegations true on all three counts. (§§ 664 & 187, subd. (a); 12022.53, subd. (c).)[2]

---

[1] All undesignated statutory references are to the Penal Code.

[2] Three separate assault with a firearm counts (§ 245, subd. (b)(2)) were charged as alternatives to the attempted murder charges. However, it is unknown whether the jury returned verdicts on those three counts because there are no verdict forms — either completed or left blank — for those counts in the record. The reporter's transcript suggests these counts were dismissed on the prosecutor's motion, as does the probation officer's pre–sentencing report, but the record does not show a motion or such dismissals.

For the murder of Eric A., the trial court sentenced Rodriguez to an indeterminate term of 50 years to life, comprising 25 years for the murder and 25 years for the gun–use enhancement. On the attempted murder convictions, the court imposed a determinate term of 71 years, 8 months, consisting of a mid–term seven years as the principal term on Ira K.'s attempted murder count, plus a 20 year gun–use enhancement, and two consecutive two year, four month subordinate sentences on the Jacob N. and Seth C. attempted murder counts, each of which was enhanced with a full 20 years for the gun–use.

Rodriguez appeals, raising three contentions:

(1) The judgment must be reversed in its entirety because trial counsel was constitutionally ineffective for having failed to timely obtain and present expert testimony "on age-related factors relevant to [Rodriguez's] mental state" regarding the four substantive counts.

(2) Separately, the three attempted murder convictions must be reversed because the jury was prejudicially misinstructed on a "kill zone" theory of concurrent intent that was inapplicable in this case.

(3) Finally, the determinate sentence on the attempted murder convictions must be modified because the trial court erred by imposing three 20–year use enhancements when only one full–term use enhancement was proper. Instead, the enhancements on the two subordinate attempted murder counts should have been calculated — as were the sentences on the offenses themselves — as one–third of the 20–year base, i.e., six years, eight months each.

The People dispute Rodriguez's first two claims, but agree that the determinate sentence was erroneously calculated, and the judgment should be modified accordingly.

## FACTUAL BACKGROUND

Because Rodriguez does not bring a sufficiency of the evidence claim, and the parties do not disagree on the basic facts, we need not chronicle the trial evidence in

3.

exhaustive detail.  Instead, since Rodriguez's claims are rooted in primarily legal contentions, we need only recount the material facts.  We do so, however, " 'in the light most favorable to the judgment.' " (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

In September 2020, Rodriguez (age 20) attended a birthday party in Sonora.  Rodriguez brought a gun to the party, which he occasionally displayed to the other party–goers.  About 10:00 or 11:00 that night, Brodie S. (age 18), posted a Snapchat video of the assembled party group and captioned it with "Happy Birthday Kiko," who was another one of the partiers.

Meanwhile, in another part of town, Eric A. (age 17), Ira K. (17), Jacob N. (19) and Seth C. (17) — close high school friends and football teammates — were "hanging out" and playing video games.[3]  Brodie knew Eric, either from school or social media, but they were not friends.

Eric saw Brodie's Snapchat video from the birthday party and posted a laughing–while–crying emoji in response.  Brodie saw Eric's emoji reply and, thinking Eric was mocking him, messaged him back, asking him what was so funny.  Eric replied, "You guys just make me laugh," but added "don't act tough like you want to fight."  Brodie replied, "Do you want to fight?"  Thus, the first step was taken in what would result in an otherwise completely avoidable tragic outcome for all those involved.

Although Eric and Brodie had started this back–and–forth over Snapchat, they eventually moved to phone calls.  During one of these calls, Rodriguez joined in, telling Eric, " 'You know who I am?  You know where I'm from? …  I'm Grumpy from Modesto,' " apparently "trying to, you know, intimidate [Eric]."  Eric responded to

---

[3] For clarity of exposition, for the remainder of our factual summary we dispense with privacy–masking secondary surname initials, and instead simply refer to the individuals by their given names.  We mean no disrespect.

Rodriguez with something like, "You're not a gangster.  You're not what you think you are."[4]

The exchange soon turned to a possible fight to settle this now–intensified emoji brouhaha.  Brodie finally told Eric to show up to fight him or he and his group would kill Eric's family.  Eric agreed to come fight.

Brodie said that this was to be a one–on–one fight between just the two of them.  Even so, Brodie realized that they would both bring friends as back–up, so Rodriguez and two others from the party agreed to join Brodie's group.  In fact, Rodriguez exclaimed, "Let's go, let's go. I'm down."  He also reminded them that he had his "nine" with him.[5]

In the meantime, Ira told Eric he did not think the fight was a good idea.  Nevertheless, Eric was upset because his family had been threatened, so Ira agreed to be Eric's backup and the two then left in Ira's Toyota Tacoma truck, with Ira driving.  Worried that Brodie and his group might not play fair, they called Jacob and Seth for extra help in case Eric and Ira got "jumped."  They stopped by Jacob's house where Jacob and Seth agreed to go along, following in Jacob's Dodge Ram truck.  None of the four was armed.

Rodriguez's group arrived at the agreed–upon high school parking lot, parked their car in a darkened area of the lot, and waited — growing angrier as they did so.  Eric and

---

[4] Rodriguez used the moniker "Grumps" or "Grumpy," and claimed to be a member of the Norteños criminal street gang.  Witnesses said he often made gang–style comments and flashed gang signs.  Whether any of this was true, or was mere gang "wannabe" boasting, is not known.  The probation officer's pre–sentencing report contains no gang–related background information on Rodriguez and there is nothing to suggest that any of the others — either Eric A., his friends, or the others at the birthday party — were gang–involved.  The prosecution also did not offer gang evidence or theories at trial.

[5] Presumably meaning a 9 mm. semi–automatic handgun.  Later, before being apprehended after fleeing to Utah following the shooting, Rodriguez told a relative there that he had "blasted a fool" with a 9 mm. back in Sonora.  Seven expended 9 mm. shell casings were later found at the crime scene.

Ira then arrived, and Ira parked his truck across the lot from where the Rodriguez group's car was parked. Jacob and Seth soon appeared, and parked their truck *behind* Ira's.[6]

Rodriguez, Brodie, and the other members of their group walked towards the two parked trucks. As he approached Ira's truck, Rodriguez drew his gun from his waistband and thrust it through the partially opened passenger side window. Ira recalled that when he looked up from setting his parking brake, he was looking down a gun barrel. Ira said Rodriguez's finger was on the trigger, and that he thought he was going to be killed.

Rodriguez demanded which of the two was Eric. Ira did not answer, but one of Rodriguez's cohorts standing nearby (probably Brodie) identified Eric as sitting in the passenger seat. Rodriguez then struck Eric in the head with his gun.[7]

Eric grabbed Rodriguez's arm and pushed it back out the window. At the same time, Ira "dropped the clutch" and started to "peel out," but Rodriguez immediately opened fire from "point–blank" range with three shots.

One shot struck Eric in the right side of his chest and penetrated his right lung and heart with a wound that within a "couple minutes" turned out to be fatal. The fatal bullet's trajectory was horizontal, entering Eric's torso 21 inches below the top of his head. The bullet itself was found inside Eric's left–side chest cavity during the post–mortem exam.

Later examination of Ira's truck showed a shattered passenger–side window and two entry bullet holes in the passenger door. There was one exit hole on the interior side of the passenger door, and after the interior passenger door padding was peeled away, the other exit hole was located, and a spent bullet was found lying inside the passenger door.

---

[6] The exact distance separating the two parked trucks was not precisely determined, but testimonial estimates ranged from five to 20 feet. (See also People's Exhibits 14, 17, and 19.)

[7] This firearm assault on Eric A. was not charged.

These two holes were located one below the door's armrest and the other near the door handle.

There was damage to the lower dashboard and speaker wiring below the steering column on the driver's side, but no additional bullet was found inside the truck. The bullet, or perhaps a fragment, that had damaged the steering column and lower dashboard area of Ira's truck may also have grazed Ira's knee, although Ira did not suffer a bullet wound.

When Rodriguez's shots were being fired, Ira started to speed out of the parking lot, not yet realizing that Eric had been hit. At the same time, Jacob started up his truck, and he too began to drive away, following Ira. Jacob said that right after Rodriguez fired into Ira's truck, Rodriguez turned towards him, and he saw a muzzle flash. Neither Jacob nor Seth was hit.

Subsequent examination of Jacob's truck revealed three bullet holes: one on the bottom of the front license plate, one in the passenger–side quarter panel beneath the antenna, and one near the bottom of the passenger door. Inside the passenger door a spent bullet was recovered. Jacob's truck also had a flat front right tire, where another spent round was later found inside.

As the two trucks began to drive away, Rodriguez stopped firing but only because his gun started "clicking," indicating that it had either "jammed or [was] out of ammo." Rodriguez and his crew then jumped into their car and chased the fleeing trucks.

During the chase, Brodie asked Rodriguez if he had shot someone. Rodriguez coldly replied, "Anybody can get it." A nonplussed Brodie later testified he thought it best at that point to not ask any further questions of Rodriguez. At one point during the pursuit, Rodriguez leaned out the rear passenger seat window and attempted to fire at the escaping trucks, but once more his gun only "clicked" and would not fire.

Rodriguez's group finally abandoned their chase and went back to the birthday–party house. Once there, they were described by other partiers as being "pumped, like

7.

something happened" and "over the top."  Rodriguez bragged to them that he had "let off five rounds."

Rodriguez thereafter fled with his girlfriend to Utah where he was arrested 10 days later.  The details of his stay there, what he said and to whom, his apprehension by local authorities, and his return to California are not material for our purposes.  Rodriguez chose not to testify at trial, and the defense rested without presenting any affirmative evidence.

## DISCUSSION

## I.  Ineffective Assistance of Trial Counsel (IAC)

Rodriguez first contends that the judgment must be reversed in whole because trial counsel was constitutionally ineffective for having failed to timely obtain and introduce expert testimony regarding "youth–related mental factors, based on brain science," which would have allegedly mitigated — or possibly eliminated — Rodriguez's culpability regarding premeditation, deliberation, and even an intent to kill, based on the fact he was only 20 years old at the time of his crimes.  We are not persuaded.

### A.  Additional Factual Background

On January 24, 2023,[8] counsel filed a motion to continue the then–set trial date of January 30, based on counsel's last–minute realization that he needed more time to seek and obtain an expert witness, "if appropriate," to explore potential avenues for bringing a mental defense in the case.[9]

In support of the motion, counsel explained that he had experienced technical difficulties preparing a PowerPoint presentation for use at trial, and he contacted the State

---

[8] All subsequent date references are to 2023 unless otherwise indicated.

[9] Counsel had been representing Rodriguez since January 2022.  He had earlier been granted two continuances in order to further prepare for trial, including one to explore the possibility of obtaining expert testimony on a possible change of venue motion that was never brought.

8.

Public Defender's Office for assistance.  An (unnamed) public defender emailed counsel a PowerPoint that she supposedly had used in a trial of an (unnamed) 19–year–old defendant charged with murder, in an (unknown) case in an (unnamed) court and jurisdiction.  This PowerPoint purportedly showed that the public defender had used an (unnamed) expert witness "to testify about the development of the human brain and the ability of a person under the age of 25 years to form the intent to kill, malice aforethought, and permutation [*sic*]."[10]

Counsel said this expert's testimony had supposedly "detailed the development of the human brain, how it develops over time, [and] that the frontal lobe of the brain … can take until age 25 years to fully develop.  [¶]  Further, the frontal lobe of the brain controls a person's impulse control and decision–making."  Counsel added that although he was previously aware of neurological development issues in cases involving younger adults, he had only viewed them from a sentencing perspective.

Counsel explained he had "left a message" for this expert at her "personal phone number," but she had not yet returned his call.  Her "office had e-mailed [him] her CV and fee schedule," and he expected to "meet with" the public defender "later [that] afternoon" in an unspecified location, and "hope[d] to get a direct dial or cell phone number for the expert," although he did not explain how these hoped–for numbers would have been any different from the expert's "personal phone number" at which he had earlier left his message.

The prosecutor filed a response objecting to the continuance on several grounds. In his reply brief, defense counsel for the first time referred to a " 'White Paper on the Science of Late Adolescence — A [G]uide for Judges, Attorneys, and Policy Makers,' published by the Center for Law Brain & Behavioral [*sic*] the Mass General Brigham

---

[10] The PowerPoint was not included in counsel's moving papers or offered later at the motion hearing.

Hospital and the Harvard Medical School Teaching Hospital (published in 20223) [*sic*]).” Counsel said it was "attached" (it was not) but also said he would provide a copy to the trial court before the motion hearing.[11]

Counsel did not indicate when, where, or from whom this document was obtained, and did not say whether he had yet met with or talked to this still–unidentified expert. Counsel also did not define the rather hazy term "late adolescence," either as it was used in the enigmatic "white paper," or whether counsel believed it included a 20–year–old Rodriguez.

At the January 27 motion hearing, the trial court first asked counsel whether he was unaware of the possible relevance of young adult brain development until he saw the public defender's PowerPoint. Counsel replied that he was cognizant of the "general concept," but he had previously only viewed it from the perspective of sentencing, being aware of the strict limitations of section 28.[12]

---

[11] Counsel's reply brief in the record has no attachments. At the motion hearing, the trial court did refer to an unidentified 69–page document it said it had not had time to fully review, but it too is not part of the record. Rodriguez's appellate counsel requested the superior court to supplement the record with these documents, but the superior court clerk responded that neither "an attachment or hardcopy were provided for filing," and were "not in the Court's Record."

[12] Section 28 proscribes evidence offered to show or negate a capacity to form relevant mental states based on "mental disease, mental defect, or mental disorder," i.e., "diminished capacity." (§ 28, subd. (b).) In addition, section 29 correspondingly provides that "any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states [including] … intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (§ 29; see also § 25, subd. (a) ["The defense of diminished capacity is hereby abolished [and] evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."].)

Nonetheless, counsel insisted that once he saw the PowerPoint, and talked to its author,[13] he "realized" there might possibly be an age–related "issue that goes straight to intent," because age is not a "disease, defect, or disorder," evidence of which is proscribed under section 28.

The court pointed out that the motion did "not tell me what you expect to find [or] how long it's going to take you to find it." The court asked counsel if he had spoken to the supposed expert yet, and counsel said he had. However, counsel admitted that this particular expert would not "be able to help me in a timely fashion" after all and, in addition, that she actually "tends to deal where there is also some organic brain damage."[14]

Counsel went on to add that his now non–expert did give him "the name of somebody else," but again not identified, and that he was "hopeful that I can get a report from whichever expert I find within a couple of months."

The court remarked:

> "[H]opeful is not a very convincing term. It suggests as you sit here today you have no reasonable basis to believe that you will have any expert at all within th[e] two months [counsel requested], nor do you know what that expert might say, nor can you offer the Court any indication of what testimony you would expect to

---

Apropos counsel's comment regarding his beliefs regarding *other* uses of such evidence, also see section 25, subdivision (c): "[E]vidence of diminished capacity or of a mental disorder *may be considered by the court* … at the time of sentencing or other disposition or commitment." (Italics added.)

[13] Counsel did name the public defender at the hearing, but she did not appear and no further information was offered with regard to her case, including the elusive PowerPoint.

[14] The record does not show whether the public defender's case involved "organic brain damage" in addition to her defendant's age of 19, nor was anything offered to suggest Rodriguez did either. Similarly, there was no discussion as to whether an incompletely "developed" frontal lobe might constitute a mental "disorder" or "defect" within the meaning of sections 28 and 29.

11.

elicit from that expert.  [¶]  So you're basically asking for a continuance without giving me any information as to what material evidence you would have."

Court and counsel then engaged in an extended back and forth, regarding age, young persons in general, whether an expert witness would even be needed to tell jurors that young people are impulsive and lack maturity, or that an expert should be allowed to present such quotidian observations, let alone whether anyone could opine that a 20 year old cannot form an intent to kill nor premeditate and deliberate before killing someone.

In the end, the court finally concluded:

"So I don't have to make a decision about the admissibility of the [hypothetical] testimony at this stage.  If you told me, Hey, I have an expert who's ready to go, or at least is partly ready to go, or is willing to at least come in and tell you what he thinks he would testify to … we can have [an evidentiary hearing].  I don't even have that.  Not only do I not know what the guy is going to say, I don't even know if such a person exists, nor do I know how long it would take you to find a person, if such a person exists. …  [T]here [is] not enough of a basis for a good cause finding by this Court for a continuance.  [¶]  So therefore, the motion to continue is denied."

**B.  Legal Background**

To prevail on an IAC claim, a criminal defendant bears the burden of *proving* it. Such proof must satisfy two distinct but equally crucial components: "A [defendant] must show that counsel's performance was deficient, *and* that the deficiency prejudiced the defense."  (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*), italics added; *Buck v. Davis* (2017) 580 U.S. 100, 118 (*Buck*); see *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  Both components of the test "are mixed questions of law and fact subject to our independent review."  (*In re Gay* (2020) 8 Cal.5th 1059, 1073 (*Gay*); *In re Long* (2020) 10 Cal.5th 764, 774 (*Long*).)

As to the first component, the constitutional standard of performance by criminal defense counsel is not satisfied by formulaic or conclusory incantations applied in hindsight.  (Cf. *Buck, supra,* 580 U.S. at p 118 [the first prong "sets a high bar"].) Moreover, the standard is one of "reasonableness," which must be viewed from trial

counsel's perspective at the time of the challenged act or omission. (*Burger v. Kemp* (1987) 483 U.S. 776, 789; *Strickland, supra*, 466 U.S. at pp. 688–690; *People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

Similarly, it is presumed that counsel made all significant decisions in the exercise of their reasonable professional judgment. (*Cullen v. Pinholster* (2011) 563 U.S. 170, 196.) Thus, "the *absence of evidence* [of deficiency] cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' " (*Burt v. Titlow* (2013) 571 U.S. 12, 23 (*Burt*), italics added; cf. *Gay, supra*, 8 Cal.5th at p. 1073 ["[W]e ask whether *any reasonably competent counsel* would have done as counsel did." (Italics added.)]; see *Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Harrington*) ["standard for judging counsel's representation is a most deferential one"]; *Bell v. Cone* (2002) 535 U.S. 685, 702 [same].)

At the same time, we must be mindful that "[t]here are countless ways to provide effective assistance [and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland, supra*, 466 U.S. at p. 689.) Rarely is there only one reasonable strategy for a defense attorney to adopt when representing a client in a criminal case. That other strategies might exist, or might appear in hindsight to have potentially stood a better chance at success, does not make the strategies trial counsel ultimately employed unreasonable or show that counsel's performance was constitutionally deficient. (See *Maryland v. Kulbicki* (2015) 577 U.S. 1, 4; *People v. Jennings* (1991) 53 Cal.3d 334, 379–380.) More precisely here, " '[c]riminal trial counsel have no blanket obligation to investigate possible "mental" defenses, even in a capital case.' " (*In re Scott* (2003) 29 Cal.4th 783, 825.)

To establish that investigative pretrial omissions were constitutionally ineffective, Rodriguez must first show that trial counsel knew or should have known that further investigation could turn up materially favorable evidence. Second, Rodriguez "*must establish* the nature and relevance of the *evidence* that counsel failed to present or

13.

discover." (*People v. Williams* (1988) 44 Cal.3d 883, 937, italics added.) Lastly, "[t]o establish deficient performance, [Rodriguez] must *demonstrate* that counsel's representation 'fell below an *objective* standard of reasonableness,' [citation]" *as measured by* " 'prevailing professional norms.' " (*Wiggins, supra*, 539 U.S. at p. 521, italics added.)

These primarily fact–based considerations are more properly brought on habeas corpus, not direct appeal. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 (*Mendoza-Tello*); cf. *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 [on direct appeal, "deficient performance [can only be] based upon the four corners of the record"].)

Moreover, the first component of the test notwithstanding, under the second component a defendant must *also prove* prejudice "that is a ' "demonstrable reality," ' not simply speculation.' [Citations.] Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted …, i.e., a probability sufficient to undermine confidence in the outcome.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 (*Fairbank*), italics added.) Significantly, "[i]t is not enough for the defendant to show that the errors had some *conceivable effect* on the outcome of the proceeding." (*Strickland, supra*, 466 U.S. at p. 693–694, italics added; cf. *Harrington, supra,* 562 U.S. at p. 112 [a reasonable probability of a different result "must be substantial, not just conceivable"]; cf. *People v. Thompson* (2022) 83 Cal.App.5th 69, 92 ["Because defendant's prejudice contention is essentially speculative, it must be rejected."].)

## C. Analysis

At the outset, it is important to clarify a preliminary point. Rodriguez does not question the trial court's denial of counsel's motion to continue the trial in order for counsel to hunt for expert testimony that he speculated he *might* be able to find, nor does Rodriguez argue that the court erred by finding that counsel had not established good cause for a continuance. Indeed, Rodriguez acknowledges that "the [trial court's] denial [of the continuance motion] was within the court's broad range of discretion."

14.

When properly framed, the real question is whether trial counsel was constitutionally ineffective for not discovering this *possible* ground for an additional *possible* trial defense *earlier* than he did. The appellate record shows only that counsel became aware of a potential defense avenue just before trial was set to begin, how he became aware of it, and how he then sought to obtain time to perhaps quixotically search for and retain an expert who *might* be able to provide a meaningfully concrete analysis of Rodriguez and the details of *this* case, and further *might* be able to develop admissible expert testimony.

Therein lies the fundamental problem: Rodriguez's IAC argument at this stage *assumes* several speculative premises are true, but none of them is *shown* on the appellate record. Put another way, the only *evidence* of trial counsel's alleged constitutional shortcomings is a matter of *when* he discovered a hypothetical defense, i.e., its *timing,* not its substance.

Even were we to presume — which we do not — that constitutionally competent counsel would have identified, evaluated, researched, sought, and obtained admissible expert testimony during a pre–trial assessment of the facts and circumstances of *this* particular case *earlier* than counsel did here, Rodriguez's IAC contention is still predicated on *when* counsel discovered this potential defense and *when* he sought his trial continuance.

Simply put, Rodriguez's IAC claim puts the proverbial cart before the horse by assuming the substantive merits of the underlying claim, without ever having *proved* them, and instead concludes IAC based solely on timing. Moreover, Rodriguez does not *show* where (and when and how) this supposed constitutionally significant *temporal line* should be drawn, nor provide any relevant authority in support.

For purposes of the first prong of the test, nothing in the appellate record *shows* what the "prevailing professional norms" were at the time of trial in such a way as to demonstrate that counsel's performance fell on the wrong side of this undefined temporal

15.

line so as to be constitutionally lacking. Mere conclusory hindsight is not enough, especially when it fails to show what should have happened, let alone when.

As regards the second component of the IAC test, a similar conclusion also ensues: nothing in the appellate record *proves* that counsel's allegedly tardy discovery was prejudicial. We re–emphasize that the focus of Rodriguez's IAC claim is temporal. However, he has failed to meet his burden to demonstrate that the trial court would have been more likely to have granted a continuance in order for counsel to seek a defense expert had he realized the idea sooner, or brought his motion to continue earlier than he did, let alone that this speculative evidence would have also probably affected the ultimate result in the case. Instead, Rodriguez again begs the question because he assumes that there would have been such strongly probative evidence but without ever *showing* who these experts were, what they would say, or even whether their testimony would be admissible.

As now presented, Rodriguez's IAC claim is at core whether trial counsel was ineffective because he did not identify a possible mental defense earlier than he did and then persuade the trial court to grant him a continuance so he could make further inquiries. The potential substance, and admissibility, of the speculative evidence appellate counsel now tries to inject into our inquiry — by insisting we should consider it in our analysis on direct appeal — is not only beside the point, it is premature.

That having been said, and when properly framed, we turn to the details of Rodriguez's IAC contention and the applicable constitutional test.

*i. Prong One: Ineffectiveness*

As noted, "[t]o establish deficient performance, a [defendant] must *demonstrate* that counsel's representation 'fell below an *objective* standard of reasonableness,' [citation]" *as measured by* " '*prevailing professional norms*.' " (*Wiggins, supra*, 539 U.S. at p. 521, italics added.)

16.

That is the first difficulty here. There is no *evidence* of any "prevailing professional norms" showing that constitutionally adequate counsel for the 20–year–old Rodriguez in these circumstances would have attempted to challenge the prosecution's proof of the mental states required for the offenses charged in this possible manner, let alone that such a challenge would also *prove* that trial counsel's supposedly tardy realization of this possibility fell short of the *objective* standard of constitutional reasonableness under the facts and circumstances of this case.

No new trial motion was brought on IAC grounds, where an evidentiary record might have been created, nor was trial counsel's performance otherwise challenged in the trial court. Although appellate counsel argues and asserts as much in her briefing, appellate briefs are neither a substitute for nor a vehicle by which to provide expert testimony as to the prevailing professional norms, nor can they retrospectively provide supporting *evidence* to satisfy the first prong of the test.

Appellate counsel cites an unpublished 2017 opinion from which she attempts to distill a basis for prong one IAC by asserting that other "defense attorneys were producing expert testimony of the type" that suggested some defendants might not fully be able to premeditate and deliberate. (Citing *People v. Lopez* (July 11, 2017, B263519) [nonpub. opn.].)

Aside from avoiding the temporal question, counsel's citation to this unpublished opinion is wholly inappropriate. (Cal. Rules of Court, rule 8.1115, subd. (a).)[15] More importantly, reference to this particular opinion is also factually misleading because in that case an evidentiary hearing with an actual proffered expert witness was held, and

---

[15] Appellate counsel uses *The Utility Reform Network v. Public Utilities Com.* (2014) 223 Cal.App.4th 945 as justification for referring to this unpublished opinion. It is not only unpersuasive, it is self–defeating. In that case the appellate court referred to its own prior unpublished opinion *in the same matter*, and then *only* to supply factual background for its new opinion *in the same case*, something which is an exception to the prohibition. (*Id.* at p. 951, fn. 3; Cal. Rules of Court, rule 8.1115, subd. (b)(1).)

17.

after which the trial court precluded the expert from testifying, finding her testimony irrelevant. No expert *testimony* was ever "produced" in that case as counsel claims. Thus, appellate counsel's assertion that "long before" Rodriguez's trial, "developmental psychologists had been testifying regarding this issue," and relying on the unpublished *People v. Lopez* opinion as an example ("e.g.") in support, is unavailing. Moreover, the *People v. Lopez* court did not ever reach the merits of the admissibility issue, and instead affirmed by finding any possible error harmless.

Appellate counsel's argument that this unpublished case "show[s] such evidence was being produced in trial courts," not only misreads the facts of the case itself, but it also wrongly pretends to be an example of, or authority for, such evidentiary "production."

Indeed, the fact that the only authority appellate counsel has provided in support of the argument is an improperly cited and factually distinguishable unpublished opinion undermines any claim that "prevailing professional norms" at the time of the trial in this case would have, in hindsight, condemned trial counsel's performance as constitutionally ineffective under prong one of the IAC test. Rather, the fact we even mention counsel's citation to non–published non–authority actually serves to show why this issue should be raised and resolved if at all on habeas, where an *evidentiary* record might be developed — on both components of the IAC test — and where a true inquiry can be had; one based this time on *evidence*, not on idle speculation about unknown experts, references to supposedly authoritative social science "white papers," an inappropriately cited unpublished opinion, and an unrevealed PowerPoint regarding a trial, the details and results of which are equally unknown.

In the end, Rodriguez has neither provided any evidence, nor offered any persuasive argument or authority, to carry his burden to satisfy the first prong of his IAC claim. Whether, on habeas corpus, a properly qualified criminal defense trial expert could or would opine that trial counsel's belated realization of a theoretical mental

18.

defense constituted constitutionally and unreasonably deficient pre–trial preparation in this matter is not established on this record. For purposes of direct appeal, therefore, Rodriguez has failed to satisfy the first component of his IAC claim.

*ii. Prong Two: Prejudice*

Setting aside for a moment the fact that our primary focus to this point has been on the temporal issue of *when* trial counsel discovered a potential mental state issue and brought his motion to continue, it is also helpful to analyze the second prong of Rodriguez's IAC claim in terms of how counsel's allegedly tardy realization affected the ultimate results in the case, not merely the trial court's denial of his motion to continue.

Accordingly, the first component notwithstanding, we reiterate that to satisfy the second component of IAC, a defendant must also "*prove* prejudice that is a ' "demonstrable reality," not simply speculation.' [Citations.] Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted …, i.e., a probability sufficient to undermine confidence in the outcome.' " (*Fairbank, supra,* 16 Cal.4th at p. 1241, italics added.)

The operative term in this inquiry is *probability*, not *possibility*. In other words, "[i]t is not enough for the defendant to show that the errors had some *conceivable* effect on the outcome of the proceeding." (*Strickland, supra*, 466 U.S. at p. 693, italics added.) Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694; *People v. Thompson* (2022) 83 Cal.App.5th 69, 90–91 [a demonstrable reality, not simply speculation].)

Under this prong, we undertake a multi–part analysis to determine whether defense counsel failed to adequately investigate before trial. (*Long*, *supra*, 10 Cal.5th at p. 778; see also *Wiggins, supra,* 539 U.S. at pp. 534–536.) We examine "what '*evidence* counsel failed to discover and present in [the] case' *and* whether there is 'a reasonable

19.

probability that a competent attorney … would have introduced [such *evidence*]'
[citation], *and* then …  address whether 'there is a reasonable probability that [the trier of
fact] would have returned' a different verdict if it 'had … been confronted with [that]
*evidence*.' " (*Long, supra*, at p. 778, italics added, citing *Wiggins, supra,* at pp. 534–
535.)  Then, and only then, do we go on to *weigh* the proposed new *evidence* against the
underlying strength of the prosecution's case.  (*Long, supra*, at pp. 784–785; cf. *Wiggins,
supra,* at p. 534 ["In assessing prejudice, we reweigh the *evidence* in aggravation against
the totality of available mitigating *evidence*."  (Italics added.)].)

We accentuate the term "evidence" for obvious reasons, because Rodriguez has
provided none.

For purposes of a second prong analysis then, if trial counsel here had become
aware of the possibility that "brain science" — whatever that means — was a viable
avenue from which to explore a possibly admissible mental defense theory earlier than he
did, is it reasonably *probable* that the ultimate result of the proceedings would have been
different?  In a conclusory assertion, Rodriguez insists it would, but just like his prong
one argument, he has not *shown* it.

Phrased differently, Rodriguez's prong two prejudice argument once again
*presumes* that a constitutionally effective attorney would have been able to find a
qualified expert who would have been able to offer admissible *evidence* — in spite of the
strict limitations of sections 28 and 29 — of such probity so as to produce a sufficiently
probable outcome to undermine confidence in the ultimate outcome of the case.[16]

---

**16** Notably, when discussing the continuance motion, the trial court said it might
not admit the evidence counsel speculated he sought, suggesting instead that it might be
found irrelevant or even not a proper subject for expert testimony.  Rodriguez's prejudice
argument thus additionally assumes that an already skeptical trial court would have
admitted such an unknown expert's unknown testimony.  Rodriguez tries to finesse this
point by insisting any contrary admissibility ruling by the trial court would have been an
abuse of discretion.  However, we cannot find an abuse of discretion based on a ruling

20.

Rodriguez urges us to find that a hypothetical "brain science" expert's testimony would have been so compelling that it would *probably* — not merely *possibly* — have outweighed the prosecution's evidence to such an extent as to alter the jury's verdicts in this case. This is a heavy burden in any case, but it has not been established in this case. Rodriguez has offered nothing to support any of his unstated presumptions and the only "evidence" in the appellate record is a reference to an unknown PowerPoint presentation and "white paper," an inapt non–published opinion, and some general references to other legal arenas where "brain science" has been used to mitigate some youthful defendants' culpability in other contexts. In the end, "[w]e cannot determine whether [any of Rodriguez's contentions are] correct without a more complete factual record." (*Fairbank, supra,* 16 Cal.4th at p. 1242, citing *Mendoza-Tello, supra,* 15 Cal.4th at p. 266.)

Just as with our prong one conclusion, the record is insufficient to prove prong two prejudice. Rodriguez has not shown a substantial *probability* that a different result would have been reached if trial counsel had been able to find and present a "brain science" expert's testimony in such a way as to undermine confidence in the outcome of Rodriguez's trial. (*Strickland, supra,* 466 U.S. at p. 694; see *Buck, supra*, 580 U.S. at p. 118 and *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

Thus, because Rodriguez has failed to satisfy either prong of the IAC test, his claim must be rejected.

---

that was never made, regarding the admission of evidence that was never proffered, let alone excluded.

Once again, this highlights the underlying problem with Rodriguez's IAC claim on direct appeal: he has failed to provide any *evidence* from which we might begin to assess its impact. We cannot speculate on the propriety of a trial court evidentiary ruling based on a hypothetical expert's equally hypothetical qualifications and the unknown substance of their hypothetical testimony.

## II. The Attempted Murder Convictions and The "Kill–Zone" Theory

Rodriguez next contends the three attempted murder convictions must be reversed because the trial court prejudicially erred by instructing on a "kill zone" theory of concurrent intent under the facts and circumstances of this case. We agree.

### A. Additional Factual Background

Using the standard instruction, CALCRIM No. 600, the trial court instructed the jury on the attempted murder counts as follows:

> "The defendant is charged in Counts 2–4 with attempted murder. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that:
>
> "1. The defendant took at least one direct but ineffective step toward killing another person;
>
> "AND
>
> "2. The defendant intended to kill that person.
>
> "A *direct step* requires more than merely planning or preparing to commit murder[.] A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt."

The court then added an optional part of the instruction:

> "A person may intend to kill a primary target and also secondary targets within a zone of fatal harm or 'kill zone.' A 'kill zone' is an area in which the defendant used lethal force that was *designed and intended to kill everyone in the area around the primary target*.
>
> "In order to convict the defendant of the attempted murder of [Jacob N., Ira K., and Seth C.], the People must prove that the defendant not only intended to kill Eric [A.] but also either intended to kill [Jacob N., Ira K., and Seth C.] or intended to kill everyone within the kill zone.

22.

"In determining whether the defendant intended to kill [Jacob N., Ira K., and Seth C.], the People must prove that (1) *the only reasonable conclusion* from the defendant's use of lethal force, is that the defendant *intended to create a kill zone*; *and* (2) [Jacob N., Ira K., and Seth C.] were located within the kill zone.

"In determining whether the defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following:

"The type of weapon used;

"The number of shots fired;

"The distance between the defendant and [Jacob N., Ira K., and Seth C.];

"The distance between [Jacob N., Ira K., and Seth C.] and the primary target.

"If you have a reasonable doubt whether the defendant intended to kill [Jacob N., Ira K., and Seth C.] or intended to kill Eric [A.] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [Jacob N., Ira K., and Seth C.]."  (Second italics added.)

In his initial closing argument regarding these counts, the prosecutor quickly zeroed in on his theory of the case, telling the jury:

"So kill zone.  Kill zone is an area in which the defendant used lethal force — shooting a gun is lethal force — that was designed and intended to kill everyone in the area around the primary target.  [¶]  We must prove not only that the defendant intended to kill Eric [A.] from close range, but also *either* — either, so got a choice — intended to kill the boys *or* intended to kill everyone in the kill zone."  (Italics added.)

This was the last time the prosecutor mentioned the disjunctive nature of the two slightly different alternative intents.  He began by addressing the attempted murder of Ira K.:

"So Ira [K.], attempted murder.  [Rodriguez is] firing into that car.  He knows that Ira [K.] is in the driver['s] seat. … Ira [K.] told you that he's looking at the barrel of the gun. … [Rodriguez] knows Ira [K.] is there, and he shoots.  *Does he care whether or not he hits Ira [K.] or not* ?  [¶]  Intended to kill everyone within the kill zone.  And Ira [K.] is in the kill zone.  [¶]  You can't have a kill zone, like … this is the kill zone with the gun, but my phone right next to it is not in kill zone.

23.

That's not how it works. There isn't, like, this fine line. Maybe it's not in the kill zone if I take the phone and put it way over on the other end of the courtroom. But not right here and that's where Ira [K.] was. [¶] No. Actually, Ira [K.] was here. That's the kill zone. [¶] So I submit to you … that this is evidence that he wanted to kill everybody in the kill zone. He's firing multiple shots into the car … [and] it looked like there was an impact from around inside the steering column. [¶] … The only shots he took [into Ira K.'s] truck, was [*sic*] into the door of that car. … Ira [K.] is in the killing zone [and Rodriguez is] guilty of attempted murder of Ira [K.]" (Italics added.)

Notably, no argument was made that Rodriguez specifically intended to kill Ira K.

As to the attempted murders of Jacob N. and Seth C., the prosecutor said:

"Now let's talk [about Jacob N. and Seth C.], because … it's not a group package. … [¶] [Seth C.] is in the passenger seat [of the second truck]. I submit to you, that *in terms of potentials for real bad things happening*, Seth [C.] is in that killing zone. Because at least two of the shots were [fired at the second truck]. Killing zone. Intending to kill. You've already fired into [the first] vehicle at close range. … And now he's firing at that [other truck]." (Italics added.)

Again, no suggestion was made that Rodriguez intended to kill either Jacob N. or Seth C.

Finally, summarizing his explication of the kill zone theory, he concluded:

"The evidence as to Ira [K.]. right there, right next to Eric [A.] — he's in that killing zone. He's lucky to be here today *because of how close he was*. [¶] Seth [C.], the defendant is going to shoot that gun until he can't shoot it anymore. … Thank God that gun jammed or it had a small magazine because he'd still be firing today if he could.

"So the evidence as to Seth [C.] in the driver seat of Jacob [N.]'s car,[17] killing zone, attempted murder. [¶] Jacob [N.], hey, I don't mean to leave him out. The difference in aiming [at] a car when it's moving, *you don't care*. That car is moving. So anybody in that car, in that area of the door and what not, you're in the killing zone. So, Jacob [N.], attempted murder. … I'm asking you to find [Rodriguez] guilty of attempted murder as to each one of [the three victims] because they were in that killing zone." (Italics added.)

---

**17** The prosecutor misspoke. Seth C. was in the passenger seat and Jacob N. was in the driver's seat.

24.

In response, defense counsel disagreed with the prosecutor's characterization of the kill zone theory. He insisted that in such a case "in order to kill the target, [a defendant is] trying to kill everybody. … [T]o be in the kill zone, the lethal force … was designed and intended to kill everyone in the area around the primary target. And in this case that's just not there. There is no kill zone. At least Seth [C.] and Jacob [N.] in the separate truck were not in any kind of kill zone and if — Ira [K.] doesn't qualify for a kill zone because he's just the one person. That doesn't mean there can't be attempted murder on him. It just means that the kill zone does not apply to this case."

The prosecution's rebuttal closing argument, which was presented by a different deputy district attorney, made no further mention of the kill zone theory, nor offer a response to defense counsel's argument as to its inapplicability.

## B. Legal Background and the Standard of Review

The offense of attempted murder requires a specific intent to kill each and every individually alleged victim, regardless of the underlying theories of liability. (*People v. Mumin* (2023) 15 Cal.5th 176, 191 (*Mumin*)).

Thus, unlike a case involving collateral killings, an intent to kill one particular person does not transfer into an *attempt* to kill a surviving victim. (*People v. Souza* (2012) 54 Cal.4th 90, 120 [the doctrine of transferred intent "does not apply to attempted murder"]; *People v. Bland* (2002) 28 Cal.4th 313, 331 (*Bland*) ["Defendant's guilt of attempted murder must be judged separately as to each alleged victim."].)

That said, in certain very limited circumstances, a defendant may be liable for the attempted murder of a surviving victim under a theory of *concurrent* intent, or as it is popularly labeled, the "kill zone" theory. So, " '[w]here the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Mumin, supra,* 15 Cal.5th at p. 192.) Thus, a defendant may by his or her actions be properly found to have *intended* to kill *both* the primary victim *and*

25.

*concurrently also intended* to kill any other persons in this so–called "zone" of harm.  (*Id.* at pp. 191–192.)

In contrasting the *transferred* intent theory applicable in a multiple murder scenario with the *concurrent* intent of a kill zone theory of multiple *attempted* murders, our Supreme Court has made it quite clear that:

> "While the intent to kill one target transfers to others actually killed, the doctrine will not extend that lethal intent to others who may be assaulted or injured but do not die. To be guilty of the attempted murder of a person who survives, *the defendant must intend to kill that survivor*.  [Citation.]  … [¶] … '*Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder* even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must *intend to kill the alleged victim, not someone else*. The defendant's mental state must be examined as to *each* alleged attempted murder victim.  Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others.' "

(*Mumin, supra*, 15 Cal.5th at p. 191, italics added.)

When properly applied, "[t]he kill zone theory acknowledges this distinction and allows a jury to find that a defendant intended the attempted murder of the person the defendant is attempting to kill (the target), and, concurrently, that the defendant *also intended to kill* others in the vicinity (the kill zone) *in the pursuit of the target*." (*People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1078–1079 (*Ibarra*), italics added.)

This "zone" is not simply defined by mere spatial proximity or contiguity.  Rather, it is wholly a product of the defendant's underlying mens rea: "[A] kill zone is an area which *a defendant intentionally creates in order to kill* all those within it *to ensure* the primary target's death." (*Mumin*, *supra*, 15 Cal.5th at p. 193, italics added.)  Therefore, first there must be evidence that the defendant *intended* to create such a zone of fatal harm and that the alleged victims were within that zone.  (*Ibid*.)  Second, this "zone of fatal harm" must have been intentionally designed so as to be not merely "*around* the primary target," but also that "the defendant intended to kill *everyone* present *to ensure*

26.

*the primary target's death.*" (*People v. Canizales* (2019) 7 Cal.5th 591, 597 (*Canizales*), italics added.)

Even within these narrow limitations, the kill zone theory must also be strictly construed to apply only where "the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the *only reasonable inference* is that the defendant intended to create a zone of fatal harm." (*Canizales, supra,* 7 Cal.5th at p. 607, italics added.) Only then will the evidence "support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales, supra,* 7 Cal.5th at p. 607; cf. *Mumin, supra,* 15 Cal.5th at p. 193 [the kill zone "theory is a … particularly narrow one"]; *id,* at p. 212 ["the theory is a complex one that must be employed with care and explained with precision"].)

The *Canizales* court pointedly warned of the risks of inappropriate use of the kill zone theory:

> "We emphasize that … trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate. Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only reasonable inference* from the circumstances of the offense is that a defendant *intended to kill everyone* in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction."

(*Canizales, supra,* 7 Cal.5th at p. 608, italics added; see also *id.* at p. 607 ["[a]s past cases demonstrate … the potential for misapplication of the kill zone theory remains troubling"].)

Consequently, "[e]vidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra,* 7 Cal.5th at

27.

p. 607.)  Similarly, "[t]he far more commonplace act of firing one or a few shots at a group may supply the actus reus for a number of crimes.  But, standing alone, it does not support a conclusion that the shooter intended to create a kill zone around the primary target in order to ensure that primary target will die."  (*Mumin, supra,* 15 Cal.5th at p. 193.)  Phrased differently, there is no implied malice attempted murder offense. (*People v. Lee* (1987) 43 Cal.3d 666, 670.)

On appeal, we independently determine whether substantial evidence supported a kill zone instruction and assess whether the evidence presented was such that the *only* reasonable inference was that the defendant intended to create a zone of fatal harm around the primary target as described above.  (*Ibarra, supra,* 106 Cal.App.5th at p. 1077; *Canizales, supra*, 7 Cal.5th at p. 607.)

## C. Analysis

As noted, the trial court instructed the jury with the standard attempted murder instruction, which stated the necessity of individualized intent as to each named victim in all three counts, but the trial court also instructed on the kill zone theory of concurrent intent.

"Justification for instructing on concurrent intent requires substantial evidence that: 1. the defendant intended to kill a primary target; 2. he concurrently intended to achieve that goal by killing all others in the fatal zone he create[d]; and 3. the alleged attempted murder victim[s] w[ere] in that zone.  These requirements protect against an improper attempted murder conviction based only on a conscious disregard for life. 'Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. … [T]he kill zone theory does not apply where "the defendant merely subjected persons *near* the primary target to lethal risk.  Rather, in a kill zone case, *the defendant has a primary target and reasons* [that] *he cannot miss that intended target if he kills everyone in the area in which the target is located.  In the absence of such evidence, the kill zone instruction should not be given.*" ' "  (*Mumin, supra,* 15 Cal.5th at pp. 203–204, italics added.)

28.

We first find that the evidence the prosecution produced at trial did not meaningfully circumscribe a clearly defined and legally sufficient "kill zone." The prosecutor's later arguments to the jury only exacerbated this evidentiary shortcoming: was Rodriguez's intended kill zone Ira K.'s truck, or both trucks in combination, or the immediately surrounding parking lot as the trucks began to flee the scene? The prosecutor ambiguously implied that it could be each, or even all three.

Even assuming that all three attempted murder victims were within the prosecutor's amorphous kill zone, there was nothing from which the *only* reasonable inference to be drawn was that Rodriguez *intended* to create this nebulous kill zone *around* Eric A., *and* that Rodriguez *concurrently intended* to kill Ira K., Seth C., and Jacob N., *in order to* ensure Eric A.'s death.

We agree the evidence shows Eric A. was Rodriguez's primary target and that his attack was directed from the outset at Eric A., who had questioned Rodriguez's gang–bona fides. However, as to Ira K., the circumstances at most show a conscious disregard of the risk that Ira K. might be injured or killed when Rodriguez fired into that truck. Ira K.'s presence in the driver's seat appears to have been incidental; he was seated on the other side of the truck while Rodriguez fired *at* Eric A. from close range, and was not shot even as Ira K. began to drive away.

Moreover, Rodriguez's shots at Jacob N. and Seth C.'s truck, as they attempted to flee, were made only *after* Rodriguez had already fired his shots at Eric A. sitting in Ira K.'s truck. Similarly, this was also only *after* Rodriguez had isolated Eric A., his intended victim, who was sitting only a couple feet away when Rodriguez pistol–whipped him, just before he opened fire with the fatal shot.

Instructive here is *People v. Booker* (2020) 58 Cal.App.5th 482 (*Booker*), where the court found giving the kill zone instruction reversible error. There, the defendant had similarly shot into a car with two individuals inside, "fir[ing] a total of three to seven shots directed at the front driver's side," where the shots "were directed at [the alleged primary target in the driver's seat] at close range," and only "the driver's side front window of [the car] was shattered," "there were no bullet holes … that would have

29.

reflected a spray of bullets," and there was no "evidence any bullets reached … where [the nontargeted victim] was sitting[.]" (*Id.* at p. 500.)[18]

Even were we to assume Rodriguez's intended kill zone only comprised the passenger compartment of Ira K.'s truck, as it was argued in *Booker* — but something the prosecutor here did not — Seth C. and Jacob N. were seated inside a different truck, parked behind and away from Rodriguez's point–blank aim into the passenger side window of Ira K.'s truck and into Eric A.'s chest. Equally, nothing suggests that Rodriguez shot at the second truck for any reason other than it too started up, and Jacob N. began to drive in Rodriguez's direction in his attempt to flee following Ira K. Again, this was only *after* Rodriguez had already identified and targeted his intended primary target in Ira K.'s truck, Eric A., and had shot him.

As the *Canizales* court explained, "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Canizales, supra*, 7 Cal.5th at p. 607.) So too here.

Based on the evidence before us, we cannot conclude that the *only* reasonable inference is that Rodriguez *intended* to create a kill zone that encompassed both trucks — or even the surrounding parking lot as the prosecutor implied — so as to *ensure* that his desire to kill Eric A. would succeed *and* at the same time he intended to kill anyone else in that "zone" *in order to* accomplish that primary goal. Such a fluid and mobile "kill zone" that would expand to include secondary shots at the second truck, after having already shot his primary target, militates against a theory that Rodriguez's second volley

---

[18] Rodriguez pointedly relies on *Booker*, but the People have not attempted to distinguish it — or even to cite it — in their response. Whether such silence is to be construed as acquiescence, or misdirection by omission, we expect and rely on more from the People.

of shots at Jacob N.'s truck was to "ensure [Eric A.'s] death." (*Canizales, supra*, 7 Cal.5th at p. 597).

The key in this case is to keep in mind that the *transferred* intent doctrine as applied to murders and the *concurrent* intent theory for attempted murders are not analogous. The former is a legal fiction that does not require an intent to kill a collateral victim who was only incidentally killed, whereas the latter instead *requires* a "concurrent" *individualized specific intent to kill* as to each and every attempted murder victim.

Even more limiting, the kill zone theory also requires an additional mens rea that the defendant also intended to create this "zone" *so as to ensure* that not only is the intended "target" victim killed, but so too is everyone else in that zone. That extra wrinkle of *motivation*, even over and above the prerequisite intent to kill, is what fundamentally curbs the kill zone theory in most cases and is why "there will be relatively few cases in which the [kill zone] theory will be applicable." (*Canizales, supra*, 7 Cal.5th at p. 608; *Mumin, supra,* 15 Cal.5th at p. 203 ["only a rare set of circumstances would warrant a concurrent intent instruction"].)

Here, the prosecutor told the jury, "Does [Rodriguez] care whether or not he hits Ira [K.] or not?", implying it did not matter. To the contrary, that was the *only* relevant question for the jury; it not only *did* matter, it was crucial. If Rodriguez did not "care," then it would not be of concern whether he intended to kill Ira K. or not, which is of course the whole point in the concurrent intent theory of attempted murder. If a shooter does "not care," they cannot harbor an individualized intent to kill. If Rodriguez did not "care" whether Ira K. was killed in order to achieve his goal of killing Eric A., he did not intend to kill Ira K., and the kill zone theory was therefore inapt.

Likewise, when discussing the Seth C. and Jacob N. counts, the prosecutor told the jury that "in terms of potentials for real bad things happening, Seth [C.] is in that killing zone. Because at least two of the shots were [fired at Jacob N.'s truck]. Killing zone. Intending to kill. You've already fired into [another] vehicle at close range. … And now he's firing at that [other truck]."

31.

First of all, "potentials for real bad things happening" is most assuredly not the same as individualized intents to kill both Seth C. and Jacob N., and merely shooting at a fleeing truck does not, without more, show an individualized intent to kill its occupants. "Bad things happening" seems to be a euphemistic substitute for the no longer valid "natural and probable consequences" theory of attempted murder liability. (§ 188, subd. (a)(3).)[19] Similarly, the argument does not explain how "potentials for bad things happening" serves to ensure that Eric A., Rodriguez's intended primary target, would be killed.[20]

Secondly, while referring to the Seth C. and Jacob N. charges, the prosecutor also returned to his earlier theme and told the jury that "the difference in aiming [at] a car when it's moving, [is] you don't *care*. That car is moving. So anybody in that car, in that area of the door and what not, you're in the killing zone." Over and above once more equating "not caring" with an individualized intent to kill, it is unclear whether the prosecutor was implying that Jacob N.'s fleeing truck had somehow become an expanded kill zone, or a now–mobile part of Rodriguez's originally intended Eric A. kill zone. How the jury could have possibly sorted out such ambiguities only reinforces our conclusions.

Lastly, neither Seth C. nor Jacob N. was close to Rodriguez's "primary target" when he opened fire into Ira K.'s truck and Eric A. was shot at "point–blank" range by

---

**19** Moreover, if anything, "bad things happening" at best implies a "conscious disregard" on Rodriguez's part, but it does not justify using the kill zone theory: " '[T]he kill zone theory does not apply where "the defendant merely subjected persons near the primary target to lethal risk." ' " (*Mumin, supra,* 15 Cal.5th at p. 206; *Canizales, supra*, 7 Cal.5th at p. 607.)

**20** The People argue that "it is easy to picture a cone of death originating from [Rodriguez's] position at the passenger side of [Ira K.'s] truck and encompassing all four victims." Easy or not, the People's panoramic "cone of death" metaphor only begs the question, because it assumes that Rodriguez not only intentionally created this "cone of death," but that he also intended to kill everyone within the "cone," *and* that he did so in order *to kill* Eric A. Such a "cone" is not as "easy to picture" as the People would have us believe.

32.

Rodriguez. Even if Rodriguez did not "care" about these two victims, as the prosecutor argued, we cannot conclude that the *only* reasonable inference to be drawn is that Rodriguez's secondary shots at Jacob N.'s fleeing truck were somehow within the supposed kill zone and were thus intended to help achieve Rodriguez's original primary goal of killing Eric A. The *Mumin* court rejected a similar characterization:

> "The 'prosecutor's definition of the kill zone as an area in which people "can get killed" or are in a "zone of fire" was significantly broader than a proper understanding of [what] the theory permits. Indeed, it essentially equated attempted murder with implied malice murder. [Citation.] Thus, the prosecutor's argument had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory.' "

(*Mumin, supra,* 15 Cal.5th at p. 209.) This is true even more so here, the People's "cone of death" imagery notwithstanding.

We find that the jury would not have been able to meaningfully assess the prosecutor's scenarios and from them determine that "the *only* reasonable inference" was that Rodriguez intended to kill everyone in his ill–defined zone of fatal harm in order to kill Eric A. (*Canizales, supra*, 7 Cal.5th at p. 608, original italics.) "[E]ven assuming there was evidence [Rodriguez] intended to indiscriminately kill everyone in a particular area … such evidence would not have supported instructing the jury on concurrent intent," because at its core the case before us simply "is not a *concurrent intent* case." (*Mumin, supra,* 15 Cal.5th at 207, original italics.)

Just as the *Canizales* court determined in that case, we too find that "there is a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner. The [trial] court's error in instructing on the factually unsupported kill zone theory in [this] case, combined with the lack of any clear definition of the theory in the jury instruction and the prosecutor's misleading argument, could reasonably have led the jury to believe that it could find that [Rodriguez] intended to kill

33.

[all three alleged victims] based on a legally inaccurate version of the kill zone theory[.]" (*Canizales, supra,* 7 Cal.5th at p. 614.)

Reviewing the totality of the evidence, and taking heed of our Supreme Court's warning that the kill zone theory will only apply to relatively few cases, we cannot find that the *only* reasonable inference to draw here is that Rodriguez: (1) intended to create a fatal zone of harm around Eric A.; (2) *so as to* ensure Eric A.'s death; (3) that Ira K., Jacob N., and Seth C. were *in* that zone; and (4) that Rodriguez intended to kill everyone in that zone. Instructing on the kill zone theory in these circumstances was therefore error. (*Canizales, supra*, 7 Cal.5th at p. 608; see *Booker, supra,* 58 Cal.App.5th. at pp. 502–503.)

When added to the prosecutor's mistaken characterizations of the theory in his argument and his exclusive reliance on a kill zone theory of liability, we cannot find the misapplication of the concurrent intent theory here was harmless, under any standard, and hold that giving the concurrent intent instruction was prejudicial error. The attempted murder convictions are therefore reversed. (*Mumin, supra,* 15 Cal.5th at pp. 210–211, 213; *Booker, supra,* 58 Cal.App.5th at p. 503.)[21]

### III. Conclusion:

Rodriguez's IAC claim fails for purposes of direct appeal. We express no opinion whether it might be brought and resolved differently on habeas corpus. The murder conviction and its indeterminate sentence are affirmed.

The three attempted murder convictions are reversed because the jury was presented with a factually inapplicable concurrent intent theory of attempted murder

---

[21] The parties do not discuss — and we express no view — whether double jeopardy principles bar a retrial for either the attempted murder counts or the underlying alternatively charged firearm assault counts. (See *Mumin, supra*, 15 Cal. 5th at p. 213, fn. 15, citing *Burks v. United States* (1978) 437 U.S. 1, 10–18; cf. *Booker, supra*, 58 Cal.App.5th at p. 503, fn. 14.)

34.

liability that was further exacerbated by the prosecutor's apparent misunderstandings of the theory's limited scope and nature in his arguments to the jury. Because the attempted murder convictions are reversed, the determinate sentence is thereby also vacated, and the question of whether it was properly calculated is moot.

## DISPOSITION

The judgment is affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion.

SNAUFFER, J.

WE CONCUR:

DETJEN, Acting P. J.

MEEHAN, J.